**The UNITED STATES, Appellant,**

v.

**The CARBORUNDUM COMPANY,**
**Appellee.**

**Customs Appeal No. 75–26.**

United States Court of Customs and Patent Appeals.

June 17, 1976.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C., Andrew P. Vance, Chief, Customs Section, Herbert P. Larsen, New York City, for the U. S.

Barnes, Richardson & Colburn, New York City, attorneys of record, for appellee; Joseph Schwartz, New York City, of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

LANE, Judge.

This is an appeal from the judgment of the United States Customs Court, 74 Cust.Ct. 50, C.D. 4584, 393 F.Supp. 211 (1975), holding that certain iron-silicon alloy powder is classifiable as "ferrosilicon" under item 607.50, TSUS, as contended by the importer, rather than as alloy iron or steel powders, other than stainless steel powders, under item 608.08, TSUS, as originally classified. We reverse.

### The Merchandise Imported

The imported merchandise is an iron-silicon alloy powder which contains 75.94 percent iron, and 16.33 percent silicon. It has been specially processed in Canada by pulverizing lump ferrosilicon to a 65 mesh particle size. The powder is imported as a special ferrosilicon for use in the heavy-media separation process.[1]

### Statutes

The pertinent portions of the Tariff Schedules of the United States involved in this appeal with rates of duty in effect at the time of importation read as follows:

> Schedule 6.——Metals and Metal Products
>
> Part 2.——Metals, Their Alloys, and Their Basic Shapes and Forms
>
>     *     :     :     ×
>
> Subpart B. Iron or Steel
>
> *Subpart B headnotes:*
>
>     *     ×.     *     *
>
> 2. *Grades of Iron, Steel and Ferroalloys.*——For the purposes of the tariff schedules, the following terms have the meanings hereby assigned to them:
>
>     *     ג     *     .×
>
>      (e) *Ferroalloys:* Alloys of iron (except spiegeleisen and ferronickel, as defined in headnotes 2(c) and 2(d), supra, respectively) which are not usefully malleable and are commonly used as raw material in the manufacture of ferrous metals and which contain one or more of the following elements in the quantity, by weight, respectively indicated:
>
>        over 30 percent of manganese, or
>        *over 8 percent of silicon, or*
>        over 30 percent of chromium, or
>        over 40 percent of tungsten, or a total of over 10 percent of other alloy elements, except copper, and
>      which, if containing silicon, do not contain over 96 percent of nonferrous alloy elements, or, if

> containing manganese but no silicon, do not contain over 92 percent of nonferrous alloy elements, or if containing no manganese and no silicon, do not contain over 90 percent of nonferrous alloy elements. For the purposes of this subpart—
>
>     *     *     *     :×
>
>      (v) *ferrosilicon* is a ferroalloy which contains, by weight, not over 30 percent of manganese and over 8 percent of silicon;
>
> Ferroalloys:
>
>     .×     *.     *     *.
>
>      Ferrosilicon:

| | | |
|---|---|---|
| 607.50 | Containing over 8 percent but not over 60 percent by weight of silicon | .[0.4]¢ per lb. on silicon content |

>     *     *.     :×     *
>
> Sponge iron; iron or steel powders:
>
>      Sponge iron, including powders thereof:
>
>     *     *     ×.     *·
>
>      Other powders:
>
>        Other than alloy iron or steel . . . . . .
>
>        Alloy iron or steel:
>
>          Stainless steel powders

| | | |
|---|---|---|
| 608.08 | Other . . . . . . | .[15%] ad val. |

### Customs Court Opinion

The Customs Court relied on the headnote 2(e)(v) definition of ferrosilicon and the Government's concession that the imported goods possessed the requisite weight requirements of that definition, in finding that the imported merchandise was dutiable as ferrosilicon under item 607.50, TSUS. The court did not view the provision for ferrosilicon as limited by the definition of the term ferroalloys, viz., "alloys of iron * * * commonly used as raw material in the manufacture of ferrous metals," given in headnote 2(e), even though the provision for ferrosilicon was indented under the term ferroalloy in the TSUS. However, the court also found that even if the definition of ferroalloy was determinative of classifi-

---

1. In the heavy-media separation process (also known as the sink-float process) finely divided ferrosilicon is suspended in water to form a heavy medium slurry. Two raw materials that have different specific gravities are introduced into the slurry. Typical raw materials include a mixture of heavy ore and light waste rock. The heavier materials sink to the bottom of the slurry while light materials float on the surface of the slurry. In this way two materials can be separated from mixtures which contain them both.

cation, then the evidence of record showed that the imported merchandise was, eo nomine, ferrosilicon, which was a class or kind of iron alloy commonly used as raw material in the manufacture of ferrous metals.

## OPINION

As noted above, the dispute in this case centers about the applicability of the provision claimed by the importer, namely, item 607.50, TSUS, to the imported merchandise. The Government argues that in order for the imported merchandise to fall within the purview of item 607.50, TSUS the merchandise must not only meet the criteria for ferrosilicon, as defined in headnote 2(e)(v), but it also must meet the criteria for ferroalloys, as defined in headnote 2(e). The Government contends that the imported merchandise is not a ferroalloy because it is not an alloy of iron which is "commonly used as raw material in the manufacture of ferrous metals."

■ We believe that Congress, by indenting provisions for ferrosilicon, such as item 607.50 in question, under the term "Ferroalloys:" in Schedule 6, Part 2, Subpart B, intended that the term ferrosilicon, as used in the TSUS, be limited to those iron-silicon alloys which not only meet the statutory requirements for ferrosilicon set forth in headnote 2(e)(v), but also meet the statutory requirements for ferroalloys set out in headnote 2(e). That is, the term ferrosilicon should be construed as a further limitation on the term ferroalloys, incorporating therein all the requirements for the definition of ferroalloys. In harmony with this view is General Interpretative Rule 10(c)(i) which reads:

> (c) an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it; but, in applying this rule of interpretation, the following considerations shall govern:

(i) a superior heading cannot be enlarged by inferior headings indented under it but can be limited thereby;

which is to say that the imported merchandise must meet all the requirements for the superior heading, here "ferroalloy," in order to be classified under the inferior heading, here "ferrosilicon."

We find further support for this view in the *Tariff Classification Study* (1960), Schedule 6, Part 2, at 91, in its comment on ferronickel. In particular we note the following language:

> Moreover, it is not entirely clear that it [ferronickel] would always conform to the proposed definition of ferroalloy in that some of it may be usefully malleable.

In part because of this concern that ferronickel would not always fit the proposed definition for ferroalloy, a separate provision was established for ferronickel; that is, it was not indented under the term ferroalloy. We believe that implicit in this action is a recognition that all alloys which remain enumerated under ferroalloys in the TSUS must fit the three-part definition of ferroalloys given in headnote 2(e).

Since we have found that the imported merchandise must be "commonly used as raw material in the manufacture of ferrous metals" in order for classification under item 607.50 to be proper, we now turn to a consideration of the question of whether the imported merchandise fit this criterion.

■ As part of its dual burden of proving that the assigned classification is incorrect and proving the proposed classification correct,[2] the importer has the burden of proving that the imported merchandise is commonly used as raw material in the manufacture of ferrous metals.

General Interpretative Rule 10(e)(i) defines how use requirements (other than actual use) are to be construed:

> (e) in the absence of special language or context which otherwise requires—

> (i) a tariff classification controlled by use (other than actual use) is to be

---

**2.** *Maher-App & Co. v. United States,* 57 CCPA 31, C.A.D. 973, 418 F.2d 922 (1969); *United States v. New York Merchandise Co.,* 58 CCPA 53, C.A.D. 1004, 435 F.2d 1315 (1970).

determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i. e., the use which exceeds all other uses (if any) combined;

Therefore, on the record before us, the importer must establish that the imported merchandise belongs to a class or kind of merchandise which is commonly used as raw material in the manufacture of ferrous metals.

The evidence before us shows convincingly that lump ferrosilicon (particle size ¼″ to 2″), or powder ferrosilicon having particles of mesh size 20 or larger, is commonly used as raw material in the manufacture of ferrous metals. We must therefore consider whether the imported powdered ferrosilicon of mesh size 65 belongs to this same class or kind of ferrosilicon.

To determine whether the imported iron-silicon alloy is of the same class or kind as that commonly used as raw material in the manufacture of ferrous metals, we must look to all the pertinent circumstances. *Star-Kist Foods, Inc. v. United States,* 45 CCPA 16, C.A.D. 666 (1957). Factors which have been considered by courts to be pertinent in determining whether imported merchandise falls within a particular class or kind include the general physical characteristics of the merchandise, the expectation of the ultimate purchasers, the channels, class or kind of trade in which the merchandise moves, *Maher-App & Co.,* supra at 37, 418 F.2d at 926 (Baldwin, J., concurring), the environment of the sale (i. e., accompanying accessories and the manner in which the merchandise is advertised and displayed, *United States v. Baltimore & Ohio R. R.,* 47 CCPA 1, C.A.D. 719 (1959)), the use, if any, in the same manner as merchandise which defines the class, the economic practicality of so using the import, and the recognition in the trade of this use. *Bob Stone Cordage Co. v. United States,* 51 CCPA 60, C.A.D. 838 (1964). Susceptibility, capability, adequacy, or adaptability of the

import to the common use of the class is not controlling. *Baltimore & Ohio R. R.,* supra; *Maher-App & Co.,* supra at 37, 418 F.2d at 926 (Baldwin, J., concurring).

Many of the pertinent factors relied upon in prior cases are present here, and all show that the import is not of a class or kind commonly used as a raw material in the manufacture of ferrous metals. The record shows that the imported ferrosilicon is only used for heavy-media separation, which has been characterized as a mining operation, not manufacturing. Therefore the ultimate purchasers of the import would not be the same as the purchasers of the class of material used in the manufacture of ferrous metals. Each would have different expectations for the product and different purposes for making the purchase, and would be in different channels of trade. Furthermore, it is not commercially practical to use the import in the manufacture of ferrous metals. The record indicates that such phenomena as the turbulence in blast furnaces and the density needed to penetrate the slag or go into the metal render 65 mesh powder too fine to be used in the manufacture of ferrous metals.

Moreover, the imported goods have been specially processed to provide the import with a utility *different* from the class. The importer's witness testified that lump iron-silicon alloy of the general size used in manufacturing ferrous metals is further processed, at some expense, in an aero-fall mill and a cyclone separator to achieve a high density alloy which is fine enough for heavy-media separation use. Then the powder is fed through a magnetic separator, which removes low iron content (high silicon content) particles. This processing destroys the alloy's usefulness for ferrous metals manufacture while creating the properties necessary for heavy-media separation.

Finally, we note that the record indicates that between about 20 mesh and 65 mesh there is a natural dividing line separating two classes of iron-silicon alloys. According to the unrebutted testimony of a government witness, iron-silicon alloy powders

with particles smaller than 20 mesh are so fine that, as a class, they are not used as raw materials in the manufacture of ferrous metals. On the other hand, iron-silicon alloys in which particle size is between 20 mesh and 2 inches have a chief use as a raw material in the manufacture of ferrous metals. Thus the record reflects two distinct, nonoverlapping uses—below 65 mesh the only shown use is in heavy-media separation, above 20 mesh the only shown use is as a raw material in the manufacture of ferrous metals.

■ For the above reasons, we conclude that the importer has not met its burden of proving that the imported powder is a member of the class of iron-silicon alloy which is commonly used in the manufacture of ferrous metals.

Alternatively, the importer asserts that the heavy-media separation process is a pre-processing step in the manufacture of ferrous metals and, therefore, that the imported goods are per se used in the manufacture of ferrous metals. We cannot agree that the use of iron-silicon alloy powder in the heavy-media separation process is a use as a raw material in the manufacture of ferrous metals. First, the alloy powder is used over and over; it is not intended to be a raw material which forms a component of the ferrous metal. Second, the process is not a manufacturing step as far as the ultimate production of a ferrous metal is concerned. The process merely segregates pieces of one density from those of other densities. It in no way transforms or operates on the iron ore by modifying its composition or physical form to advance its ultimate manufacture into ferrous metal. Third, the heavy-media separation process is not limited to iron ore separation. Thus, the ultimate goal is not necessarily a production of a ferrous metal.

■ The importer further contends that Congress did not intend that the TSUS change the classification for ferrosilicon as it existed under the Tariff Act of 1930, in which fine powdered ferrosilicon was treated the same as lump ferrosilicon, both being classified under paragraph 302(i). In support of this argument the importer refers to

the *Tariff Classification Study,* supra at 92, which states that with respect to the provisions for the ferroalloys named in items 607.30 to 607.75 no rate change was made. We cannot view this statement in the study as a positive indication that no change was made in the treatment of ferrosilicon in the TSUS from the Tariff Act of 1930. In the first place the same study, page 87, points out that "there is something amiss" in the treatment of ferrosilicon under paragraph 302(i). This dissatisfaction indicates a Congressional intent to modify the provisions for ferrosilicon which existed in the 1930 Act. Moreover, the 1930 Act did not relate provisions for ferrosilicon to the term ferroalloy as does the TSUS. We therefore fail to find support for the importer's view that the ferrosilicon provisions of the TSUS were intended to be the full equivalent of the ferrosilicon provisions of paragraph 302(i) of the Tariff Act of 1930.

For the above reasons, the importer has not sustained its burden of proving that its proffered classification is correct. The judgment of the Customs Court is, accordingly, *reversed.*