LENOX COLLECTIONS, A DIVISION OF LENOX, INC., PLAINTIFF *v.*
UNITED STATES, DEFENDANT

Court No. 91–09–00651

(Dated February 2, 1996)

*Ross & Hardies (Joseph Kaplan); Wasserman, Schneider & Babb (Louis Schneider* and *Patrick C. Reed);* Lenox, Incorporated *(Robert O. Cohen)* for plaintiff.
*Frank W. Hunger,* Assistant Attorney General; *Joseph I. Liebman,* Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice *(Susan Burnett Mansfield);* United States Customs Service *(Stephen Berke),* of counsel, for defendant.

OPINION

GOLDBERG, *Judge:* In *Lenox Collections v. United States,* 19 CIT 345, Slip Op. 95–36 (Mar. 9, 1995), this Court held that material issues of fact prevented it from deciding this case by way of summary judgment. Con-

---

sequently, the case is now before the Court following trial *de novo*. At trial, plaintiff Lenox Collections ("Lenox") argued that the United States Customs Service ("Customs") incorrectly classified the subject merchandise as "kitchenware * * * of porcelain," under subheadings 6911.10.50 and 6911.10.80 of the Harmonized Tariff Schedule of the United States ("HTSUS"),[1] with a duty rate of 26 percent *ad valorem*. According to Lenox, Customs should classify the subject items as "ornamental ceramic articles * * * [o]f porcelain" under subheading 6913.10.50, HTSUS, with a duty rate of 9 percent *ad valorem*. The Court exercises its jurisdiction pursuant to 28 U.S.C. § 1581(a) (1988). Upon review of the evidence and testimony presented at trial, the Court enters judgment in favor of Lenox.

## BACKGROUND

The merchandise at issue is a set of twenty-four small porcelain containers called the "Spice Village." Each elaborately decorated container is shaped like a Victorian house and stands approximately three inches high. The Spice Village set comes with a hardwood rack in which it may be displayed.

## DISCUSSION

### A. *The Presumption of Correctness:*

Customs' classification of the subject merchandise as kitchenware enjoys a statutory presumption of correctness. 28 U.S.C. § 2639(a)(1) (1988). Lenox bears the burden of overcoming this initial presumption. *Id.*

### B. *Classification of the Subject Merchandise According to Principal Use:*

Plaintiff and defendant agree that the HTSUS provisions for "kitchenware" and "ornamental ceramic articles of porcelain" are classifications controlled by use, other than actual use. *See Lenox Collections,* 19 CIT at 346, Slip Op. 95–36 at 3. According to HTSUS Additional U.S. Rule of Interpretation 1(a):

> [A] tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use * * * . *Id.*

Defendant argues that "principal use," as used in Rule of Interpretation 1(a), is defined as the "one use * * * which exceeds *all* other uses." (D's Pretrial Memorandum at 14.) Defendant further argues that the subject merchandise cannot be classified using a principal use analysis because it does not have one use that exceeds all others. *Id.* According to defendant, the merchandise has at least two significant uses, neither of which exceeds all other uses combined. *Id.*

---

[1] The merchandise at issue entered the United States from March to September of 1990. Customs classified the merchandise under both subheading 6911.10.50, HTSUS and subheading 6911.10.80, HTSUS because subheading 6911.10.50 was renumbered as 6911.10.80 on or about June 1, 1990. The text of the provision, however, was not altered in any way relevant to this case.

Defendant's argument lacks merit for two reasons. First, defendant fails to recognize that Rule of Interpretation 1(a) focuses on the principal use of the class or kind of goods to which an import belongs, not the principal use of the specific import. *Group Italglass U.S.A., Inc. v. United States,* 17 CIT 1177, 1177, 839 F. Supp. 866, 867 (1993) (emphasis omitted). Second, defendant's definition of "principal use" is incorrect. Under older tariff schedules, classifications controlled by use, other than actual use, were determined according to "chief use." *Conversion of the Tariff Schedules of the United States Annotated Into the Nomenclature Structure of the Harmonized System: Submitting Report* at 34–35 (USITC Pub. No. 1400) (June 1983). "Chief use" was defined as "that use which exceeds *all* other uses." *Id.* The concept of "chief use," however, caused administrative difficulties for Customs. *Id.* It was therefore replaced by the concept of "principal use" when the HTSUS was enacted. *Id.* "Principal use" is defined as the use "which exceeds any other *single* use." *Id.* Consequently, the fact that the merchandise may have numerous significant uses does not prevent the Court from classifying the merchandise according to the principal use of the class or kind to which the merchandise belongs.

## C. *Determination of the Class or Kind of Goods to Which the Merchandise Belongs:*

In order to determine the class or kind of goods to which an article belongs, the Court must examine all pertinent factors. *United States v. Carborundum Co.,* 63 CCPA 98, 102, 536 F.2d 373, 377, *cert. denied,* 429 U.S. 979 (1976). These factors may include: (1) the general physical characteristics of the merchandise; (2) the expectation of the ultimate purchasers; (3) the channels of trade in which the merchandise moves; (4) the environment of the sale (e.g. the manner in which the merchandise is advertised and displayed); and (5) the usage of the merchandise. *Id.*

Consequently, this case requires the Court to determine whether pertinent factors indicate that the subject merchandise is of the class or kind of goods used principally as kitchenware, or of the class or kind used principally as ornamental articles. If pertinent factors show that the subject items serve as "utensils used in the kitchen; pots, pans, etc.," this indicates that the items are of the kind used principally as kitchenware. **Webster's New World Dictionary of American English** 745 (3d college ed. 1988). On the other hand, if pertinent factors show that the items are used as "decorative" articles, this indicates that the items are of the kind principally used as ornamental articles. *Id.* at 955.

In its analysis of pertinent factors, the Court will also take relevant explanatory notes into account. *See Lynteq, Inc. v. United States,* 10 Fed. Cir. (T) 112, 118, 976 F.2d 693, 699 (1992) (finding that explanatory notes, though not legally binding, are indicative of the interpretation of HTSUS headings). If pertinent factors show that the merchandise's usefulness is subordinate to its ornamental character, then the explana-

tory notes suggest that the merchandise is of the kind used principally for ornamental purposes. For example, a decorative article incorporating an incidental container that can be used as an ashtray would be classified as ornamental according to the explanatory notes. However, if pertinent factors indicate that the "decorated articles serve a useful purpose no less efficiently than their plainer counterparts," then the explanatory notes suggest that the items are of the kind principally used as kitchenware.

1. *Physical Characteristics of the Merchandise:*

The first pertinent factor that the Court considers concerns the physical characteristics of the merchandise. Although physical characteristics indicate that these containers can hold spices, this alone does not determine the proper classification of the merchandise. *See G. Heileman Brewing Co., Inc. v. United States,* 14 CIT 614, 620 (1990) (holding that although ceramic steins could hold beer, they were chiefly used for ornamental purposes); *United States v. Baltimore and Ohio R.R. Co.,* 47 CCPA 1, 5, C.A.D. 719 (1959) (holding that although after-dinner coffee cups could hold hot beverages, they were chiefly used for ornamentation on shelves or racks). This is especially true because the physical characteristics of the merchandise indicate that these containers fail to hold spices as efficiently as their plainer counterparts. According to Lenox's expert on containers, Kenneth Holmes, plainer spice jars have a more practical design; they generally have a grip area and a shaker top, and they are usually more durable and clear.

In contrast, the Spice Village containers are shaped like Victorian houses, which are not particularly easy to grip. Each house is elaborately decorated in a pastel-colored, floral motif. Each house has a removable, hand-painted roof with protruding windows. Each house has a 24 karat "Lenox" seal on its bottom that certifies that the house is made of "fine porcelain." The set also comes with a wooden rack which is to be affixed to a wall for the perennial display of the set. In sum, the Court finds that physical characteristics suggest that although the Lenox set may hold spice, it is of the class of goods that is used principally for decorative purposes.

2. *Expectations of the Purchasers:*

The second factor that the Court examines concerns the expectations of the purchasers of the Spice Village. Upon review of the evidence, the Court finds that purchasers of the set expect to use it principally for decorative purposes.

At trial, Lisa Archambault, Director of Concept Development at Lenox, testified that when she learned that another collectible manufacturer, Franklin Mint, offered a spice jar set, she decided to develop a competitive Lenox product. Hence, she developed the Spice Village to appeal to the same purchasers that are interested in collecting the Franklin Mint set. According to Ms. Archambault, these purchasers buy the set with the expectation of collecting and displaying it, not with the

expectation of using it for cooking. *See G. Heileman Brewing Co.,* 14 CIT at 620 (finding that purchasers' intent to collect certain beer steins indicated that the steins were ornamental articles).

In addition, evidence presented by defendant shows that people can purchase plainer and more efficient spice jar sets from reputable department stores for approximately $15 to $50. In contrast, people must pay approximately $360 to buy the elaborately decorated Spice Village. The higher price of the Spice Village indicates that people are willing to pay much more for a collectible and decorative set. In other words, the purchasers will pay much more for the Spice Village because they expect to use it to adorn their homes.

### 3. *Channels of Trade:*

The third factor that the Court examines, the channels of trade in which the merchandise moves, fails to indicate the class or kind to which the merchandise belongs. At trial, the developer of the Spice Village, Lisa Archambault, testified that Lenox sells the set by direct mail only. Exhibits introduced by Lenox at trial indicate that decorative and collectibles items, such as porcelain thimbles, are sold by direct mail. On the other hand, exhibits introduced by defendant show that items which are principally used as kitchen utensils are also sold by direct mail.

### 4. *Environment of the Sale:*

The fourth factor that the Court examines is the environment in which the merchandise is advertised and displayed. Initially, the Court recognizes that advertisements describe the merchandise as both functional and decorative. For example, an ad made for television tells viewers:

> Back in 1889 when Lenox began making fine china, people took time and pride in craftsmanship. Homes were lovingly decorated with handcrafted items that held their value for generations. This Lenox heritage continues in the Lenox Spice Village. Twenty-four porcelain spice jars, each one an old fashioned miniature house, a delightful collection to display and enjoy. Every house bears the world-famous Lenox trademark, and each is decorated and painted by hand. They're airtight and washable, too* * * . Bring old fashioned charm and craftsmanship into your home with a Lenox Spice Village.

A second ad, in the form a letter written by the Director of Lenox Collections and addressed "Dear Collector," provides in part:

> I am so delighted to tell you about the new *Lenox Spice Village*— because I think it's a collection that you are going to fall in love with * * *. The set consists of 24 distinctive spice jars—each in the shape of a miniature house—with a custom-designed rack to hold the complete spice village * * *.
>
> As you may know, porcelain miniature houses have fascinated and charmed collectors for over 200 years. The very best have traditionally been decorated in lively, fanciful colors. And even when they

were first made, in 1750 in England, most of these sculptured houses were designed to be *more* than ornamental. They were made to serve a specific purpose—as inkwells, money boxes, match holders, and the like.

Another printed ad provides:

Fine porcelain spice jars * * * each a delightful miniature house, at home in a charming spice rack[.] A joy to collect, to cook with, to display[.] Yours exclusively from Lenox[.]

Take a pinch of cinnamon from a Georgian townhouse. Parsley from a Queen Anne villa. And a dash of pepper from your Swiss chalet.

This is *The Lenox Spice Village,* a delicious collection of spice jars—different from any you have ever seen before. Each jar is an original work of art in the tradition of the miniature houses so prized by collectors the world over.

Although the Court recognizes that ads describe the merchandise as both decorative and functional, the Court finds that the ads stress the decorative nature of the containers. At trial, Lenox's expert in the areas of marketing, advertising, and semiotics, Elizabeth Hirschman, Ph.D., testified that the ads emphasize that the houses are unique, hand-crafted, made of fine porcelain, and bear the Lenox seal. She also testified that the ads point out the long-standing tradition of collecting miniature houses like those in the Spice Village. According to Ms. Hirschman, the ads have been designed to imply that the Spice Village is a fanciful, perfect set, that a housekeeper with good taste would use to decorate her home, and then pass down to future generations. Ms. Hirschman admitted that the ads also portray the houses as being useful for holding spices, but she claimed that they do this only to help potential buyers overcome the sense of guilt or extravagance that they might otherwise feel buying these expensive items. According to Ms. Hirschman, the Spice Village is not actually as useful as Lenox has portrayed it to be in its advertising campaign. Although the Court finds Ms. Hirschman's testimony about Lenox's advertising tactics disturbing, the Court finds the testimony credible.

5. *Usage of the Merchandise:*

The final factor that the Court examines is the usage of the merchandise. Upon review, the Court finds that Lenox presented ample evidence to show that the merchandise is used principally for decorative purposes.

First, Lenox's expert in the area of market research, Mark Chudnoff, testified that the results of two surveys of purchasers of the Spice Village indicate that the merchandise is used primarily for decorative purposes. More specifically, Mr. Chudnoff testified that a May 1990 survey of 601 purchasers of the product showed that a mere 1% used the containers for storing spices and cooking only, while 28% used the containers for decorative purposes only, with no spices stored in them. The survey fur-

ther showed that 40% used the items primarily for decorative display, although spices would be stored in them, whereas only 30% used the containers primarily for storing and cooking, but also for decorative display. A second survey of 500 purchasers, taken in October of 1990, similarly showed that 70% used the containers either entirely or primarily for decorative display, while only 28% used the items either entirely or primarily for cooking.

In addition, Lisa Archambault, the developer of the subject merchandise, testified that Lenox customers use the merchandise principally for decorative purposes. *See Baltimore & Ohio R.R. Co.,* 47 CCPA at 5–6 (finding importers well-qualified to testify that their customers used china cups and saucers for chiefly decorative purposes, and not for drinking). Further, Ms. Archambault testified that she hangs the empty Spice Village on her wall for decoration, while she keeps the spices jars that she uses when cooking on a turntable near her stove.

Finally, Lenox's cooking expert, Cara De Silva, testified that the merchandise should not be used for cooking. According to Ms. De Silva, these containers are loosely sealed, difficult to grip, and easily broken. Further, according to Ms. De Silva, the set fails to provide jars for spices which people commonly use, such as chili or curry powder. Indeed, Ms. De Silva testified that she would not use these containers for holding spices or for cooking because they are less efficient than plainer jars.

### CONCLUSION

In sum, the Court finds that contrary to defendant's assertions, the subject merchandise can be classified according to the principal use of the class or kind of goods to which it belongs. The Court further finds that Lenox presented ample evidence to prove that the subject merchandise falls into the class or kind of goods that is principally used for ornamental purposes. In contrast, the Court finds that defendant, who rested at the conclusion of Lenox's case-in-chief, failed to produce sufficient evidence to show that the subject merchandise falls into the class or kind of merchandise that is principally used as kitchenware. Upon due deliberation, the Court concludes that Lenox has rebutted the presumption of correctness in favor of Customs. The Court holds that the subject merchandise is properly classified as ornamental ceramic articles of porcelain under subheading 6913.10.50, HTSUS, with a duty rate of 9 percent *ad valorem.* Judgment will be entered accordingly.