Slip Op. 03 - 54

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - -x

ST. EVE INTERNATIONAL, INC.,              :

                        Plaintiff, :

            v.                    :   Court No. 03-00068

UNITED STATES,                    :

                        Defendant. :

- - - - - - - - - - - - - - - - - - - -x

<u>Opinion & Order</u>

[Upon trial as to Customs notices to redeliver
 imported camisoles, judgment for the plaintiff.]

                        Decided:  May 15, 2003


        <u>Coudert Brothers</u> (<u>Robert L. Eisen</u> and <u>Christopher E. Pey</u>) for
the plaintiff.

        <u>Robert D. McCallum, Jr</u>., Assistant Attorney General; <u>John J.
Mahon</u>, Acting Attorney in Charge, International Trade Field Office,
Commercial Litigation Branch, Civil Division, U.S. Department of
Justice (<u>Jack S. Rockafellow</u> and <u>Harry A. Valetk</u>); and Office of
Assistant Chief Counsel, International Trade Litigation, U.S.
Bureau of Customs and Border Protection (<u>Michael W. Heydrich</u>), of
counsel, for the defendant.


        AQUILINO, Judge:  Discerning a trend in certain female

attire in America, the U.S. Customs Service, which has since become

the Bureau of Customs and Border Protection per the Homeland

Security Act of 2002, §1502, Pub. L. No. 107-296, 116 Stat. 2135,

2308-09 (Nov. 25, 2002), and the Reorganization Plan Modification

for the Department of Homeland Security, H.R. Doc. 108-32, p. 4

(Feb. 4, 2003), issued to St. Eve International, Inc. three notices

on Customs Form 4647 to redeliver specified imported women's wear, as well as notices of liquidated damages for failure to comply with those redelivery demands.

I

The importer protested those demands and thereafter commenced this case, praying for and obtaining expedited trial (and now this decision) of its pleaded causes of action as to the contested notices. Among other things, the complaint, which has been amended, requests revocation of each notice and "such further and additional relief as this Court may deem just, including attorney's fees and costs of suit".

The trial began on April 9, 2003. Two days later, Customs issued an apparent warning to the plaintiff that another of its entries would be rejected if it failed to execute and return a proffered Wearing Apparel Detail Sheet because

> THERE ARE CURRENTLY SEVERAL ISSUES PENDING WITH RESPECT [to] IMPORTATIONS OF WEARING APPAREL BY YOUR ACCOUNT ST. EVE. INTERNATIONAL, SUCH AS PENALTY CASES, PROTESTS, AND SUMMONS TO COURT. AS THE ISSUES CENTER AROUND CLASSI- FICATION/QUOTA/VISA/ADMISSABILITY ISSUES, A REVIEW OF THE PREVIOUS ENTRIES REVEALS THAT THE INVOICE DESCRIPTION USED IS NOT SUFFICIENT TO ENSURE PROPER CLASSIFICATION.

Plaintiff's Exhibit 126, first page (capitalization in original). Whereupon counsel pressed in open court for injunctive relief from such, claimed harassment by the Bureau. See trial transcript ("Tr."), pp. 750-51.

Whatever the precise intent of Customs or reaction of its object at that moment of exchange, suffice it to state that the record developed to date herein does not support the extraordinary, additional equitable relief that the plaintiff is now also requesting.  Moreover, award of attorney's fees and expenses and costs under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. §2412, requires that the court find that the position of the United States was not substantially justified.  Compare 28 U.S.C. §2412(d)(1)(A) with Turtle Island Restoration Network v. Mallett, 24 CIT 627, 642-43, 110 F.Supp.2d 1005, 1018-19 (2000), aff'd in pertinent part, rev'd on another ground in part, 284 F.3d 1282 (Fed.Cir.), reh'g on that ground denied, 299 F.3d 1373 (Fed.Cir. 2002), cert. denied, 155 L.Ed.2d 511 (2003).  As recited in that case,

> a position can be justified even though it is not correct, and we believe it can be substantially (i.e., for the most part) justified if a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact.

24 CIT at 643, 110 F.Supp.2d at 1019, quoting Pierce v. Underwood, 487 U.S. 552, 566 n. 2 (1988).  See also Gavette v. Office of Personnel Management, 808 F.2d 1456, 1467 (Fed.Cir. 1986), and cases cited therein.

Clearly, the record at bar shows that the government satisfies at least this standard.  That is, with regard to any award under EAJA, the court cannot find that defendant's position was not substantially justified.

A

In both its complaint and amended complaint, the plain-
tiff erroneously pleads subject-matter jurisdiction pursuant to 19
U.S.C. §1581(a).  In its answer to the latter, the defendant admits
jurisdiction over entry nos. 655-1151865-0 and 655-1152655-4 under
*28* U.S.C. §1581(a)[1] while denying any jurisdiction over the third
entry at issue, No. 655-1146249-5[2].

Concurring at the least with defendant's admission, the
court, having granted plaintiff's application for expedition of
this case[3], proceeded to trial.

B

Goods encompassed by the entries numbered 655-1146249-5
and 655-1152655-4 were landed by the plaintiff under subheading
6109.10.0037 of the Harmonized Tariff Schedule of the United States

---

[1] Defendant's admission as to these entries is conditioned
upon a "deni[al] that this Court has jurisdiction under 28 U.S.C.
§1581(a) with respect to the requested revocation of the Notices
of Liquidated Damages issued in connection [there]with".  Pre-
trial Order, Schedule B-2.  See Defendant's Answer, p. 1, para.
3; p. 6, paras. 4, 5, 6.

[2] See id.  See also Defendant's Pretrial Summary Memorandum,
p. 2, paras. 5-10; p. 4, para. 1.

[3] That application was heard in open court.  The defendant
continues its objection to expedition, asserting that this ap-
proach has been to its "undue and significant detriment."  Pre-
trial Order, Schedule B-2, n. 1.

No evidence has been adduced, however, at either the hear-
ing or the trial in support of this assertion, and the record
developed does not somehow show otherwise.

("HTSUS") (2002) at a rate of duty of 17.4 percent *ad valorem* and subject to quota category 352.  According to the plaintiff, entry no. 655-1151865-0 merchandise, which arrived under HTSUS subheading 6108.91.0015 "[d]ue to an error by the broker"[4], is also "properly classified under subheading 6109.10.0037, HTSUS, subject to quota category 352."  Amended Complaint, para. 26.  That provision is set forth as follows:

> T-Shirts, singlets, tank tops and similar garments, knitted or crocheted:
>
>     Of cotton ......................................
>
>                         *   *   *
>
>         Women's or girls':
>             Underwear (352) ........................

The defendant counters that the goods of entry no. 655-1151865-0 at issue are properly classifiable under suffix 60 to this foregoing subheading as "Women's or girls': . . . Other: . . . Tank tops: Women's (339)" while those of the other two impleaded entries belong under HTSUS subheading 6114.20.0010 (2002), to wit:

> Other garments, knitted or crocheted:
>
>                         *   *   *
>     Of cotton ......................................
>         Tops:
>
>                         *   *   *
>
>             Women's  or girls' (339) ..............

---

[4] Amended Complaint, para. 22; Plaintiff's Pretrial Memorandum of Law, p. 5.

As indicated, both of the classifications posited by Customs require a visa for category 339, which the importer did not produce, ergo the Service's notices to redeliver.

The parties agree at bar that since the goods at issue are garments, their classification is controlled by the use for which they are donned. See, e.g., Pretrial Order, Schedules D-1, D-2; Plaintiff's Pretrial Memorandum of Law, p. 10; Defendant's Pretrial Summary Memorandum, p. 7 and Post Trial Brief, p. 3. Each refers to HTSUS Additional U.S. Rule of Interpretation 1(a) that

> a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use[.]

They disagree, however, with respect to the class or kind to which the imported goods belong[5], although each side refers the court to United States v. Carborundum Co., 63 CCPA 98, C.A.D. 1172, 536 F.2d 373, cert. denied, 429 U.S. 979 (1976), among other cases, for guidance in this regard. The merchandise in that particular case was an iron-silicon alloy powder for use in the manufacture of ferrous metals, but the parties take the position that the factors applied in determining therein whether that merchandise fell within

---

[5] Compare, e.g., Plaintiff's Pretrial Supplementary Memorandum of Law *passim* and Plaintiff's Exhibit 124 with Defendant's Pretrial Summary Memorandum, pp. 10-17 and Post Trial Brief, p. 2 and Tr., pp. 29-31, introducing Defendant's Exhibits BJ-1 and BJ-2.

a particular class or kind apply equally now to the women's wear

herein, to wit,

> the general physical characteristics of the merchandise,
> the expectation of the ultimate purchasers, the channels,
> class or kind of trade in which the merchandise moves,
> . . . the environment of the sale (i.e., accompanying
> accessories and the manner in which the merchandise is
> advertised and displayed . . .), the use, if any, in the
> same manner as merchandise which defines the class, the
> economic practicality of so using the import, the recog-
> nition in the trade of this use.

63 CCPA at 102, 536 F.2d at 377 (citations omitted).

II

The parties stipulated in the pretrial order, and the

evidence adduced thereafter at trial confirmed, that St. Eve

International, Inc. is known in its industry as a women's underwear

or intimate apparel company which does not advertise or market

directly to the ultimate consumers. See Pretrial Order, Schedule

C; Tr., pp. 404-05. Among other offers of proof pre-trial was that

the defendant

> does not dispute that the imported merchandise which is
> the subject of this action, i.e., merchandise which has
> been referred to as shelf bra camisoles and shelf bra
> tank tops, is sold principally in the women's intimates
> or underwear departments of walk-in retail stores, and
> further, defendant will not introduce any evidence that
> the imported merchandise is sold otherwise in walk-in
> retail stores.

Pretrial Order, Schedule C-2, para. 3.

A

Given the record since developed, the court is able to enumerate the following findings of fact:

1.  St. Eve International, Inc. is a New York corporation with its principal place of business in the "lingerie building", 180 Madison Avenue, New York, New York.  See Tr., pp. 87, 523.

2. That building and location in Manhattan are known in the trade for underwear, intimate apparel, and sleepwear.  See id. at 89, 140-41.

3.  Design of St. Eve merchandise takes place at that location.  See id. at 345.

4.  St. Eve International, Inc. sells nothing but underwear and sleepwear.  See id. at 53, 60-61.

5.  The trade in general and buyers in particular consider St. Eve International, Inc. only as a supplier of underwear and sleepwear.  See id. at 58.  Cf. Plaintiff's Exhibit 85.

6.  St. Eve International, Inc. does not deal with buyers of sportswear.  See Tr., pp. 63, 90.

7.  St. Eve International, Inc. markets its camisoles as underwear.  See id. at 57.

8. St. Eve International, Inc. sells underpants that match its camisoles.  See id. at 60.  See generally Plaintiff's Exhibits 97 and 105.  Compare Defendant's Exhibits BB and BC with Exhibit BD.

9.  The stores that purchase St. Eve camisoles offer them for sale in their lingerie and intimate-apparel departments.  See Tr., pp. 41, 46, 48-49, 160.

10. The lingerie and intimate-apparel departments of such stores are "destinations" for shoppers as opposed to arenas of casual visitation, inspection and sizing.  See id. at 284-85.

11. The stores that purchase St. Eve camisoles do not offer them for sale as sportswear.  See id. at 105.

12. Underwear and intimate apparel are marketed year-round.  See id. at 216; Defendant's Exhibits BB, BC and BD.

13. St. Eve camisoles are sold year-round. See Tr., pp. 307-08, 345; Defendant's Exhibits BB and BC.

14. Camisoles manufactured for sportswear are marketed primarily in conjunction with spring and summer.  See Tr., p. 775.

15. Retailers offer St. Eve camisoles in the lingerie sections of their catalogues.  See id. at 74; Plaintiff's Exhibit 50, second page.

16. Retailers offer St. Eve camisoles in the lingerie sections of their *Internet* websites.  See Plaintiff's Exhibit 64; Defendant's Exhibit E, p. 1.

17. The merchandise at issue herein was produced for and exported to St. Eve International, Inc. by Clifton Apparels Ltd., Chittagong, Bangladesh.  See Tr., p. 69.

18. The Clifton Apparels Ltd. plant that manufactured St. Eve's entries herein only produces underwear and sleepwear. See id.

19. The manufacture of underwear and intimate apparel requires equipment specially designed and adapted therefor. See id. at 70, 73, 154.

20. The fabric in underwear and intimate apparel should be soft to the touch. See id. at 126-27, 198, 728-29.

21. The fabric in underwear and intimate apparel should be lightweight, preferably 180 grams per square meter or less. See id. at 61-62, 347-48. Compare Plaintiff's Exhibit 89 with Plaintiff's Exhibit 25.

22. Underwear and intimate apparel should be stitched or otherwise assembled in such a manner as to minimize discomfort and visibility of its elements, e.g., straps, connections, seams, and hems. See Tr., pp. 133, 198.

23. Four-hundred-fifty-seven dozen women's and girls' cotton briefs and panties were entered by St. Eve International, Inc. per No. 655-1146249-5, classified under HTSUS subheading 6108.21.0010 and subject to quota category 352. See Plaintiff's Exhibit 87, p. 001.

24. St. Eve briefs and panties for women and girls are sometimes referred to as boyshorts, boylegs, thongs, strings, bikinis, bunpants, and hipsters, among other names. See Tr., pp.

75, 149-50, 461, 503-03, 523; Plaintiff's Exhibit 98; Defendant's Exhibit AQ; Complaint, Exhibit 5.

25. Such bottom pieces of underwear and intimate apparel comprise the majority of product imported by St. Eve International, Inc. in terms of volume and value.  See Tr., pp. 53, 58.

26. To the extent such bottom pieces of underwear were part of plaintiff's entries at bar, Customs did not dispute their classification or order their redelivery for lack of a proper visa. Cf. id. at 26.

27. The 500 dozen camisole tops also entered by St. Eve International, Inc. per No. 655-1146249-5 were style no. 65132. See, e.g., Plaintiff's Exhibit 7.  See also Plaintiff's Exhibit 87.

28.  That St. Eve style no. 65132 is comprised of 92 percent brushed cotton and eight percent spandex knit fabric with an approximate material weight of 160 grams per square meter.  See Tr., pp. 347, 400.

29.  That St. Eve style no. 65132 has a front scoop neckline, straight-cut back, and an inner shelf[6] bra.  See Plaintiff's Exhibit 7; Defendant's Exhibits B, T and AT.

30. That shelf (or self) bra consists of an additional layer of fabric wrapped inside and around the top of the camisole,

---

[6] At trial, defendant's expert witness was of the view that shelf is a bit of a misspelling or a misconception; *self* is what she considers that element of a camisole to be.  See Tr., p. 623. Cf. id. at 726.

For purposes of this case, the court accepts either spelling and concept based thereon.

and attached only thereto, with an 11/16-inch scalloped elastic band hemmed to its bottom, hanging loose within the shell that is intended to be form-fitting, slightly narrower albeit flared at the bottom.  See, e.g., Plaintiff's Exhibit 7.

31. The top edge of that St. Eve style no. 65132 is trimmed with a thin band of elastic material, has narrow, elastic "spaghetti" straps with lingerie-style adjusters and unobtrusive stitching and hemming typical of women's and girls' underwear and intimate apparel.  See, e.g., id.  See also Tr., pp. 61, 88-89, 133, 161, 204, 296, 350.

32. That St. Eve style no. 65132 does not veil completely a developed human female breast.  Cf. id. at 629-30.

33. That St. Eve style no. 65132 was imported in three basic colors, white, heather gray, and black, for sale to the May Company.  See id. at 309.

34. That St. Eve style no. 65132 was sold to the May Company along with its matching bottoms, although not via entry no. 655-1146249-5.  See id. at 76, 301-02.

35. The May Company has stores in 37 states.  See id. at 278-79.

36. The May Company purchased St. Eve style no. 65132 only for display and sale in the women's and girls' underwear and intimate-apparel departments of its stores, namely, *Filene's Basement, Hecht's*, *Robinson*, and *strawbridge's*.  See id. at 76, 86-87, 279-81, 307, 308.

37. The 344 dozen camisole tops entered by St. Eve International, Inc. per No. 655-1151865-0 were style no. 27-0180-3. See Plaintiff's Exhibit 88, p. 001. Compare Plaintiff's Exhibit 8 with Defendant's Exhibit D.

38. That St. Eve style no. 27-0180-3 is comprised of 95 percent brushed cotton and five percent spandex knit fabric with an approximate material weight of 160 grams per square meter. Ibid.

39. That St. Eve style no. 27-0180-3 was sold in three solid colors, white, ivory, and black, to *Chadwick's of Boston* along with its matching bottoms, although not via entry no. 655-1151865-0. See Tr., p. 64.

40. *Chadwick's of Boston* purchased St. Eve style no. 27-0180-3 only for display and sale in the women's and girls' underwear and intimate-apparel departments of its stores. See id. at 74-75. See also Complaint, Exhibit 8.

41. That St. Eve style no. 27-0180-3 has an open, u-shaped neckline decorated with one-inch see-through lace in the front, shoulder straps approximately one and a half inches wide that are not adjustable, and a shelf bra that consists of an additional layer of fabric wrapped inside and around the top of the camisole, and attached only thereto, with an elastic band hemmed to its bottom, hanging loose within the shell that is slightly narrower albeit flared at its bottom. Compare Plaintiff's Exhibit 8 with Defendant's Exhibit D.

42. That St. Eve style no. 27-0180-5 does not veil completely a developed human female breast. Cf. Tr., p. 658.

43. The 750 dozen camisole tops entered by St. Eve International, Inc. per No. 655-1152655-4 were style no. 65134. See Plaintiff's Exhibit 5 and Exhibit 90, p. 001.

44. That St. Eve style no. 65134 is comprised of 92 percent brushed cotton and eight percent spandex knit fabric with an approximate material weight of 160 grams per square meter. See Plaintiff's Exhibit 5.

45. That St. Eve style no. 65134 material has been dyed plum/heather in a striped pattern. See id.

46. That St. Eve style no. 65134 has a front scoop neckline, straight-cut back, and an inner shelf bra. See id.

47. That shelf bra consists of an additional layer of fabric wrapped inside and around the top of the camisole, and attached only thereto, with an elastic band hemmed to its bottom, hanging loose within the shell that is intended to be form-fitting, slightly narrower albeit flared at its bottom. See, e.g., id.

48. The top edge of that St. Eve style no. 65134 is trimmed with a thin band of elastic material, has narrow, elastic "spaghetti" straps with lingerie-style adjusters and unobtrusive stitching and hemming typical of women's and girls' underwear and intimate apparel. See, e.g., id.

49. That St. Eve style no. 65134 was sold to the May Company along with its matching bottoms, although not via entry no.

655-1152655-4. <u>See</u> Plaintiff's Exhibit 90, second page; Defendant's Exhibit BH, p. 2141.

50. St. Eve International, Inc. has marketed its style nos. 65132 and 65134 as part of its *Stretch Invisibles* and *Cami/Boyleg* promotions.  <u>See</u> Tr., pp. 360-61; Plaintiff's Exhibits 97 and 98; Complaint, Exhibit 5.

51. The St. Eve shelfbra camisoles at issue herein do not provide adequate support for sportswear by the average woman.  <u>Cf</u>. Tr., p. 661.

52. The St. Eve shelfbra camisoles at issue herein can supplant a brassiere for the average woman.  <u>Cf</u>. Plaintiff's Exhibit 13; Tr., p. 296.

B

That the government's position herein is not "substantially [un]justified" within the meaning of EAJA does not necessarily mean that it prevails on the merits. <u>See</u>, <u>e.g.</u>, <u>United States v. Ziegler Bolt & Parts Co</u>., 21 CIT 830, 971 F.Supp. 597 (1997), and cases cited therein.  At a minimum, that position must satisfy <u>United States v. Mead Corp</u>., 533 U.S. 218, 221 (2001), wherein eight justices

> agree[d] that a tariff classification has no claim to judicial deference under <u>Chevron [U.S.A. Inc. v. Natural Resources Defense Council, Inc</u>., 467 U.S. 837 (1984)], there being no indication that Congress intended such a ruling to carry the force of law, but [] h[e]ld that under <u>Skidmore v. Swift & Co</u>., 323 U.S. 134 (1994), the ruling is eligible to claim respect according to its persuasiveness.

(1)

Prior to the entries and Customs notices in response thereto that underlie this case, the Service had considered similar issues and promulgated ruling letters in New York numbered B86925 (July 11, 1997), B88682 (Sept. 4, 1997), and C81236 (Dec. 18, 1997)[Plaintiff's Exhibit 104]. The first ruling was that certain knit, tank-styled garments were classifiable as underwear per HTSUS 6109.10.0037, whereas the other two classified the garments under review as tank top outerwear under subheading 6109.10.0060. Pursuant to a request for reconsideration of those two decisions, B88682 and C82136, Customs Headquarters affirmed all three rulings, number B86925 because submissions established that the camisoles were designed, marketed and sold as underwear, whereas no such evidence had been submitted at the times of the other two rulings. See Withdrawal of Notice of Proposed Modification[7] and Affirmation of Ruling Letters Relating to Tariff Classification of Certain Knit Tank-Styled Garments, 35 Cust. B. & Dec., no. 41, p. 13 (Oct. 10, 2001)[Plaintiff's Exhibit 103, p. 1]. That affirmation was based upon reasoning which is appropriate to quote at length herein, to wit:

> The *Guidelines* [*for the Reporting of Imported Products in Various Textile and Apparel Categories*, CIE 13/88 (1988)] define "underwear" as . . .
>
> > garments which are ordinarily worn under other garments and are not exposed to view when the wearer is conventionally dressed for appearance in public, indoors or out-of-doors.

---

[7] See Plaintiff's Exhibit 100.

The instant garments meet the definition of tank tops. However, some tank tops are outerwear and some tank tops are underwear. Customs originally stated that the subject garments were fashionable camisole-styled tank tops currently popular among teens and young women as outerwear. However, based on the responses to the Proposed Notice of Modification, it is now Customs belief that the instant garments are not clearly outerwear.

In past rulings, Customs has pointed out that the merchandise itself may be strong evidence of use. Citing Mast Industries v. United States, 9 CIT 549, 552 (1985), aff'd 7[8]6 F.2d 1144 ([Fed.Cir.] 1986), citing United States v. Bruce Duncan Co., 50 CCPA 43, 46, C.A.D. 817 (1963). The importer suggests that the appearance and construction features of the garments at issue, including the "underwear weight" fabric, elasticized trim, narrow "lingerie-type" straps and snug-fit construction are characteristic of underwear. Customs does not agree that such features are limited to use in underwear. The weight and opaqueness of the fabric is appropriate for both underwear and outerwear. The narrow adjustable straps have become a popular feature on outerwear camisole-styled tank tops. Current fashion has also embraced snug-fitting garments as outerwear. Based on physical examination of the garments, the tank tops are not readily identifiable as either underwear or outerwear. The garments are ambiguous.

When presented with a garment which is ambiguous and not clearly recognizable as underwear or outerwear, Customs will consider other factors such as environment of sale, advertising and marketing, recognition in the trade of virtually identical merchandise, and documentation incidental to the purchase and sale of the merchandise, such as purchase orders, invoices, and other internal documentation. See HQ 960866, July 15, 1999; HQ 960865, dated July 15, 1999; HQ 963442, July 7, 1999; HQ 960864, July 2, 1999; HQ 960862, dated July 2, 1999; HQ 961978, dated June 17, 1999; HQ 961185, dated June 11, 1999; HQ 960906, June 3, 1999; HQ 960926, February 25, 1999; HQ 960925, February 23, 1999; HQ 960928, February 15, 1999; HQ961116, November 20, 1998; HQ 960690, September 25, 1998; HQ 959843, May 6, 1998; HQ961036, April 27, 1998; HQ 960797, February 19, 1998; HQ 960442, August 4, 1997; HQ 960391, April 22, 1997; HQ 957762, April 28, 1995; HQ 957615, May 24, 1995; HQ 957004, November 23, 1994; HQ 956351, July 7, 1994[;] and HQ 956350, July 5, 1994.

Ariela-Alpha and its sister companies are engaged in the production and sale of fine lingerie. The importer submitted a copy of Alpha-Syrlay's catalogue which indicates that Alpha-Syrlay exclusively sells intimate apparel including similar camisole-styled tank tops with matching panties. The subject garments were designed by the Director of Designing at Ariela-Alpha, who has been designing lingerie for over thirteen years, as undershirt and panty sets. Performance standards showed that the instant garments were designed to meet the washing standards for underwear which are more rigorous than the standards for outerwear. Although Ariela-Alpha failed to provide specifications establishing a difference between underwear tank tops and outerwear tank tops, in comparing the subject garments to the outerwear camisole-styled tank tops submitted by the importer, the subject garments do appear to be made of a lighter weight fabric and are cut smaller.

Each of the garments at issue is sold as a "cami and panty set" and thus have a matching panty. Statements from underwear buyers for Sears, K-mart, Boscov's and Value City Department stores indicate that the garments were purchased for sale in the intimate apparel department as "cami and panty sets." Copies of commitment sheets from these retailers substantiate that the garments were exclusively purchased as underwear. It is also clear that the garments are sold by the retailers as underwear. Photographs from showroom floors support the claim that the tank tops are merchandised and displayed as underwear and sold in the lingerie department along side other underwear garments as underwear. The importer has also established that the intimate apparel industry perceives the subject tank tops as underwear by submitting statements from buyers stating that the garments are known in the trade as underwear.

The importer has submitted several advertisements showing the garments advertised as underwear. The advertisements depict the "cami and panty sets" among other lingerie articles. Customs notes that the hang tags show the subject garments worn with the matching panties. The importer has also provided numerous print-outs from various websites showing similar lightweight, slim-fitting camisole-styled tank tops advertised as intimate apparel.

Although the manner in which an article is designed, manufactured, and marketed is not dispositive of tariff classification, Customs finds it to be persuasive in this case when determining the classification of ambiguous

tank tops.  See <u>Mast Industries, Inc. v. United States</u>, [<u>supra</u>] . . .; <u>St. Eve International, Inc. v. United States</u>, 11 Ct. Int'l Trade 224 (1987); and <u>Inner Secrets/Secretly Yours, Inc. v. United States</u>, [19 CIT 496,] 885 F.Supp. 248 (1995).

Customs emphasizes that upon physical examination the instant tank tops were not readily identifiable as outerwear or underwear.  Accordingly, this ruling does not affect the classification of the majority of tank tops which upon physical examination are clearly outerwear or underwear.

Several of the comments raised the concern that the proposed modification would have resulted in all knit cotton tank tops being classified as outerwear.  There was fear of a massive quota migration from textile category 352 to textile category 339.  However, this would not have been the result because the proposed revocation, like the current ruling, only covered a small number of garments.  Similarly, now that the subject tank tops are classified as underwear, there should not be a concern of a quota migration from textile category 339 to textile category 352.

As with any ambiguous garment, Customs recommends that importers submitting ruling requests involving tank tops which are not readily recognizable as underwear or outerwear should submit a full and complete statement of the facts, including but not limited to design, marketing and sales information.  Customs realizes that this may result in the same merchandise being classified differently when imported by different companies.  Despite Customs belief that each article has only one appropriate classification under the HTSUSA, it appears that in the case of ambiguous underwear/outerwear tank tops, the courts direct consideration of the manner in which the garments are designed, marketed, sold and recognized in the trade.  If an importer can establish that an ambiguous tank top is designed, marketed and sold as underwear, the garment will be classifiable as underwear.

<u>Id</u>., pp. 16-18 [and fourth to sixth pages].  Indeed, the courts do

so direct such consideration.  In the prior action brought by St.

Eve International, Inc., for example and which is cited in the

foregoing ruling, Customs rejected the company's classification of

its cotton pajamas and other nightwear in favor of an outerwear category that required another entry visa which was not possessed or presented by St. Eve.   Following the approach set forth in United States v. Carborundum Co., supra, the Court of International Trade overruled the Service's attempted exclusion of the company's merchandise.   See 11 CIT 224 *passim.*

Called to testify in this case was the responsible Customs National Import Specialist[8], who seemingly paid little heed to such prior court directions and the foregoing Service head-quarters ruling based thereon in concluding that the St. Eve goods had to be ordered redelivered.   See, e.g., Tr., pp. 457, 458, 472, 509, 511-12, 538.   Rather, that determination to redeliver all of the camisoles covered by the three different entries was based upon his consideration of but one such garment[9], and notwithstanding testimony that "[e]ach garment stands on it own"[10]; [w]e classify the garment presented to us"[11]; "[w]ithout looking at the garment,

---

[8] The defendant called to the witness stand a second Bureau officer assigned this select title, but she denied any respon-sibility for classification of women's underwear and thus for the decision challenged herein.  See Tr., pp. 557-58, 560-61, 569-70.  Hence, all references in this opinion to *the National Import Specialist* are to defendant's first such, responsible officer.

[9] See Tr., pp. 437, 459, 508, 536.

[10] Id. at 458.

[11] Id. at 458-59.

I have no opinion"[12]; [i]t's the total garment that's presented"[13];
and he can classify an undergarment "[b]y looking at the garment as
a wh[o]le . . . Nothing else but the garment"[14].  Nonetheless, the
National Import Specialist testified that he considers the St. Eve

> garments at issue [] indistinguishable from garments
> which are used and sold as sportswear garments or active-
> wear garments or yoga wear garments[15]

and that they present no ambiguity as to whether or not they are
underwear[16] within the meaning of the Customs Service's headquarters
ruling, supra.

(2)

Clearly, the record otherwise developed in this matter
does not support this continuing view of the defense, and the court
therefore cannot and does not concur.  Of course, the fundamental
ambiguity underlying this case is that one woman might wear that
which another would not dare to bear without more cover.  No doubt,
some of this phenomenon has been on daily display during the
National Import Specialist's walks to work in Manhattan[17], if not
also in his own home among his wife and daughters[18].  And retailers

---

[12] Id. at 522.

[13] Id. at 534

[14] Id. at 537.

[15] Id. at 506.

[16] See id. at 438, 439.  See also id. at 521.

[17] See id. at 427-28.

[18] See id. at 427.

have sought to support and advance these American propensities by placing camisoles for sale in settings not necessarily constricted by traditional concepts of intimacy and modesty. But those settings have not led the government (or anyone else connected with this case) to locate thereat or therein a single St. Eve camisole that has been ordered redelivered. On the contrary, the evidence adduced shows that the trade recognizes St. Eve's camisoles to be underwear[19], all the more so given the underpants that match[20] and are marketed with them[21]. As for the economic practicality of so using the imports, pricing did not develop at trial as a definitive issue. For example, the St. Eve style no. 27-0180-3 camisole which is at issue herein was apparently purchased by the government for $7.99 at *Marshalls*[22], whereas the St. Eve camisole that the defendant concedes to be underwear, albeit shelf-braless, is tagged with a manufacturer's suggested retail price of $12. See Plaintiff's Exhibit 16; Tr., p. 533. To the extent such pricing induces sales of the St. Eve goods to consumers, the evidence shows their environment to be that of underwear and intimate apparel. See, e.g., Tr., pp. 291-93; Plaintiff's Exhibits 38, 39, 49, 50, 71, 109. And, given that exclusive environment of sale, the record developed at bar supports an expectation that the ultimate

---

[19] See, e.g., id. at 167. Cf. id. at 58.

[20] Compare, e.g., Defendant's Exhibit C with Plaintiff's Exhibit 11. See also Defendant's Exhibit P.

[21] See, e.g., Plaintiff's Exhibits 97, 98, 105.

[22] See Defendant's Exhibit D.

purchasers of the St. Eve goods will wear them beneath other pieces of clothing in a manner within the well-settled definition of such "layering"[23] *viz.*:

> **undergarment**  Item of apparel worn under the outer garments.  These garments serve many functions.  They may protect the outer clothing from being soiled or provide a more comfortable layer between the skin of the wearer and the outer clothing.  Those garments serving this purpose are usually made from soft, washable fabrics.  Undergarments may serve to give shape to the outer garments either through constricting the body or providing support to the clothing.  It is not unusual for several layers of undergarments to be worn at the same time.  Although generally unseen, parts of undergarments may sometimes be a visible element of the costume.  Also called *underwear*.

The Fairchild Dictionary of Fashion [Plaintiff's Exhibit 78], p. 462 (3rd ed. 2003)(emphasis in original).

To be sure, defendant's witnesses testified that that expectation of the ultimate purchasers is not ironclad.  See, e.g., Tr. at 472 (Burtnik); id. at 555, 567 (DeGaetano); id. at 699, 703 (Holmes).  See also Monget, Blurring the Lines; As Innerwear Increasingly Delves into Sportswear, An Industry Grapples With the Pros and Cons of Crossover Appeal, Women's Wear Daily, Aug. 27, 2001, p. 325 [Defendant's Exhibit AW, pp. 4-7].  Nonetheless, this fact that unveils a notable trend has not been shown to broaden the channel of trade in which St. Eve camisoles are designed, knit,

---

[23] Tr., pp. 96, 103, 119, 177-78, 180-82, 244-46, 297, 316, 370-72, 402, 425, 472, 512, 522, 589, 672-74, 677, 692, 768-69. Cf. id. at 301-02, 726, 733-34.

stitched together, imported, consigned, and ultimately passed on to the public.  See, e.g., Tr., pp. 70, 89, 91, 141, 300-01.  That channel has not been shown to encompass sports- and active- wear.  See, e.g., id. at 90, 310, 398.  Rather, both sides have proven that shelfbra camisoles are to be found in an other channel for such, more-demanding dress.  See id. at 153-54, 162-63, 226-27, 316, 439-40, 494, 633 and 639-41 and Defendant's Exhibit BK, 772-74.  Compare, e.g., Plaintiff's Exhibits 17 and 116 with Defendant's Exhibits N, U, Q, and AS.

Defendant's witnesses also testified that they consider shelfbra camisoles to be substantially similar in their physical characteristics.  See, e.g., Tr. at 457, 506-07 (Burtnik); id. at 574-75 (DeGaetano); id. at 625-27, 664, 689 (Holmes).  The court can concur that those presented at trial do have similarities, but it cannot find that the St. Eve piece which has been received in evidence as defendant's exhibit M, for example, has characteristics substantially similar to those of plaintiff's exhibit 17.  Also compare, e.g., Plaintiff's Exhibit 7 with Defendant's Exhibit Q.

Be their physical differences as they obviously are, when distinctions, as here, are found to exist, Customs and the courts, as recited at length above, have resorted to consideration of the other, multiple factors articulated in Carborundum and HQ 962021, among other precedent.  The Service's National Import Specialist

did not really do so here.  For him, the presence of a shelf bra in a particular piece was the ultimate dispositive element.  See Tr., pp. 504-05, 541.  His approach has left defendant's able counsel to attempt to impress upon this case and thus the law a class or kind of merchandise not spelled out to date in the prodigious HTSUS, to wit, shelfbra camisole.  See, e.g., Pretrial Order, Schedule F-2 ("Defendant's Statement of the Genuine Issues"):

> . . . Whether the class or kind to which the subject imports belong is necessarily a class or kind of shelf bra camisole (or tank top), as the Government contends, thereby permitting a finding -- either way -- that the principal use of the class or kind is as outerwear or as underwear.

And their proposed corollary is that the

> proper path for the Court is to follow U.S. Rule of Interpretation 1(a) and determine classification by the principal use of the class or kind of goods to which the subject imports belong **and not the principal use of the specific imports**.  Lenox Collections v. United States, 19 C.I.T. 345, 346 . . . (1995).  The Court must be given a choice of uses -- outerwear or underwear -- that applies to the class, **not** to the specific imports in this action.

Post Trial Brief of Defendant, p. 3 (emphasis in original).  Neither the existing law, nor the evidence adduced herein, advances as far as they propose.  The class-or-kind competition engendered by HTSUS heading 6109 is either "T-Shirts, singlets, tank tops and similar garments, knitted or crocheted: Of cotton . . . Women's or girls': Underwear (352)" on the one hand, as opposed to "Other: . . . Tank tops: Women's (339)" under that heading or to "Of cotton . . . Tops . . . Women's or girl's (339)" under heading 6114.

Both the law and the evidence now on the record preponderate in favor of plaintiff's position per subheading 6109.10.00.37, HTSUS, and this court so concludes.

### III

In the final analysis, it cannot be overlooked that this case contests redelivery (essentially exclusion) of merchandise, which makes the matter particularly goods-specific. And, if this in turn makes the fundamental question really whether plaintiff's camisoles should have been excluded and thus ordered redelivered since they definitely are not classifiable as women's or girls' underwear, then this court certainly is not so persuaded.

The parties are hereby directed to confer and present a proposed form of final judgment in accordance with this opinion within 20 days of the date hereof.

So ordered.

Decided:  New York, New York
          May 15, 2003


                        _____
                        Judge