SLIP OP. 06-28

# UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

BASF CORPORATION,

                        Plaintiff,

v.

UNITED STATES,

                        Defendant.

</td><td>

BEFORE: CARMAN, JUDGE

Court No. 02-00260

</td></tr>
</table>

[After trial, judgment for Defendant.]

      Barnes, Richardson & Colburn (James S. O'Kelly, Frederic D. Van Arnam, Jr., Kevin Sullivan), New York, NY, for Plaintiffs.

      Peter D. Keisler, Assistant Attorney General, Barbara S. Williams, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Bruce N. Stratvert), for Defendant.

                                           Dated: February 28, 2006

## OPINION

      CARMAN, JUDGE: This opinion and judgment follow a bench trial. The issue before the Court is the tariff classification of Plaintiff's, BASF Corporation ("BASF" or "Plaintiff"), trademarked polyisobutylene amine ("PIBA") in a solution of hydrocarbon solvent. The trade name of Plaintiff's PIBA in solvent is PURADD® FD-100. In the United States, PURADD® FD-100 is used in the production of gasoline detergent additive packages. At importation, the United States Customs Service[1] ("Customs" or "Defendant") classified PURADD® FD-100 in

---

      [1]Effective March 1, 2003, the United States Customs Service was renamed the United States Bureau of Customs and Border Protection. Homeland Security Act of 2002, Pub. L.

(continued...)

tariff subheading 3811.19.00 of the Harmonized Tariff Schedule of the United States

("HTSUS").[2] Customs now claims that the correct classification of PURADD® FD-100 is in

HTSUS subheading 3811.90.00. Plaintiff submits that PURADD® FD-100 is properly

classifiable in HTSUS tariff subheading 3902.20.50. Upon due consideration of the evidence

presented at trial, post-trial briefs, and other papers presented herein, this Court enters judgment

for Defendant.


## BACKGROUND

The facts of this case were also set forth in this Court's opinion denying Defendant's

motion for summary judgment. BASF Corp. v. United States, 28 CIT ___, 341 F. Supp. 2d 1298

(2004). For ease of reference, certain pertinent facts are reiterated here. Additional Court-found

facts will be set forth herein.

This case involves seven entries of PURADD® FD-100 that BASF made between

January and July 2000. Based upon a 1995 tariff classification ruling, Customs classified the

relevant entries of PURADD® FD-100 at importation under tariff subheading 3811.19.00, which

covers "antiknock preparations . . . for mineral oils (including gasoline)" that are not based upon

lead compounds. HQ 956585 (Apr. 10, 1995).[3] After the entries in question were made,

---

[1](...continued)
107-296, § 1502, 116 Stat. 2135, 2308-09 (2002). See also 19 U.S.C. § 1 (Supp. II 2002); 6
U.S.C. § 542 n.6 (Department of Homeland Security Reorganization Plan of November 25, 2002,
as modified).

[2]All references to the HTSUS in this opinion are to the year 2000 HTSUS.

[3]Customs ruling HQ 956585 identifies the subject merchandise as "Pluradyne FD-100"
(continued...)

Customs revoked HQ 956585 and reclassified PURADD® FD-100 in tariff subheading

3811.90.00, as a gasoline detergent additive. HQ 964310 (June 26, 2001.) Because the

revocation of HQ 956585 occurred after the seven entries at issue were made, the entries before

this Court were entered in reliance on HQ 956585 in tariff subheading 3811.19.00. (See Pl.'s

Summons (Mar. 26, 2002); Pl.'s Compl. ¶ 5.) Plaintiff filed timely protests on the seven entries

claiming that PURADD® FD-100 was properly classifiable under tariff subheading 3902.20.50.

Customs denied BASF's protests. Thereafter, Plaintiff filed a timely appeal of the denied

classification protests to this Court. (See Pl.'s Summons.)

During trial, this Court heard and received evidence from both parties, and the Court

found both Plaintiff's and Defendant's witnesses to be credible.

PURADD® FD-100 is Plaintiff's trade name for polyisobutylene-amine diluted in a

saturated hydrocarbon solvent. (Trial Tr. 43.) Plaintiff's parent corporation, BASF AG,

manufactures PURADD® FD-100 in Ludwigshafen, Germany. PURADD® FD-100 is

manufactured in a three-step process. First, BASF AG, manufactures the base polymer

GLISSOPAL® 1000 in Belgium. GLISSOPAL® 1000 is a highly reactive polyisobutene

("PIB"). (Id. at 44.) In Ludwigshafen, BASF AG dilutes the highly reactive PIB with forty-

seven percent (47%) by weight of an inert saturated hydrocarbon solvent. The solvent reduces

the viscosity of the PIB and ensures that it can be pumped safely. (Id.) Second, BASF AG

---

[3](...continued)
and describes it as "a clear colorless viscous liquid, a mixture containing in part several saturated
Hydrocarbons and Poly (Isobutylene) Amine." HQ 956585. The Customs laboratory concluded
that Pluradyne FD 100 was "an additive for mineral oils (including gasoline) or for other liquids
used for the same purposes as mineral oils." Id. Pluradyne FD-100 and PURADD® FD-100 are
chemically the same. See HQ 964310 (June 26, 2001). (See also Trial Tr. 256.)

creates a reaction between the PIB-hydrocarbon solvent solution and carbon monoxide and hydrogen. The result of this reaction is a polyisobuteneoxo product. (Id.) After this reaction occurs, BASF AG removes the catalyst. The last step in the manufacture of PURADD® FD-100 is "a reaction between the polyisobuteneoxo product and ammonia at elevated temperature and pressure in the presence of hydrogen and a fixed bed transition metal catalyst." (Id. at 44-45.) "The resulting product is a solution of the PIBA in the saturated hydrocarbon solvent." (Id. at 45.) According to Plaintiff's witness, "more than 97 percent by weight of the PIBA is PIB." (Id. at 43.) At this point, BASF AG considers PURADD® FD-100 a saleable, finished, specialty chemical. (Id. at 46, 97, 148.)

Both PIB and PIBA are "sticky" substances. (Id. at 47.) BASF AG adds the saturated hydrocarbon solvent to the PIB to reduce viscosity and to safely pump, process, and store the PIB and PIBA. (Id.) The saturated hydrocarbon solvent is present throughout the manufacturing process. (Id.) Although the ratio of PIB to saturated hydrocarbon solvent has changed over time, "[t]he solvent has never exceeded 50 percent by weight of the imported product." (Id.) Plaintiff's witness testified that the solvent "has no impact on the PIBA's chemical structure or its performance as a detergent[-]active component in prepared additive packages for gasoline." (Id.)

BASF is the sole importer of PURADD® FD-100 into the United States. (Id. at 256.) Nearly all of the imported PURADD® FD-100 is used by BASF as a component of the detergent additive packages BASF sells. (Id. at 257.) However, BASF has sold small quantities of PURADD® FD-100 for non-fuel additive applications. (Id.)

At the time of importation, the Environmental Protection Agency ("EPA") required that all gasoline transferred or sold to an ultimate consumer contain a certified detergent additive that was effective at controlling port fuel injector deposits and intake valve deposits in gasoline engines. 40 C.F.R. § 80.161(a)(2) (2000). In its imported condition, PURADD® FD-100 is not an EPA certified detergent additive package.[4] (Trial Tr. 284; 397-98.) After importation, PURADD® FD-100 is blended with other items (i.e., synthetic carrier, solvents, etc.) to formulate certified deposit control additive ("DCA") packages. (Id. at 259.) PURADD® FD-100 is the "detergent-active component"[5] of a formulated DCA package. (Id. at 61, 185.) BASF sells the blended DCA package to gasoline retailers who add it to gasoline before it is sold to consumers at the pump.

### AGREED FACTS

In advance of trial, the parties agreed to the following facts:

1.     The imported merchandise is currently sold under the trade name PURADD® FD-100.

2.     PURADD® FD-100 is a registered trademark of BASF Corporation.

3.     PURADD® FD-100 was previously known as PLURADYNE® FD-100.

4.     PURADD® FD-100 is a clear, colorless liquid.

5.     The PURADD® FD-100 at issue in this case contains 53% PIBA and 47% saturated hydrocarbon solvent.

---

[4]A detergent control additive package is a "fuel additive" that "keeps the carburetor and the inflow system clean." (Trial. Tr. 61-62.)

[5]The detergent-active component of a DCA package "disperses deposit precursors and removes exhibiting deposits in the intake system." (Trial Tr. 63-64.)

6.      PURADD® FD-100 is in primary form.

7.      The saturated hydrocarbon solvent in PURADD® FD-100 constitutes less than 50 percent of PURADD® FD-100 by weight.

8.      PURADD® FD-100 is commonly used as a component of prepared additive detergent packages, which are known in the industry as deposit control additive packages ("DCA package") or detergent additive packages.

9.      After importation into the United States, PURADD® FD-100 is blended together with a synthetic carrier oil, and anti-corrosive and other ingredients to produce a fully formulated DCA package, which is then ready for sale to, and use by, gasoline marketers and retailers.

10.     Only after PURADD® FD-100 is manufactured into a fully formulated DCA package is there a product that meets the performance specifications of gasoline marketers and retailers.

11.     PURADD® FD-100 does not meet the performance specifications of gasoline marketers and retailers.

12.     VW Wasserboxer Inlet Valve Sticking Tests performed using a Volkswagen engine showed that PURADD® FD-100 caused inlet valve sticking.

13.     Fully formulated DCA packages containing PURADD® FD-100 as the detergent[-]active component are certified by the U.S. Environmental Protection Agency ("EPA") for use in the United States as detergent additive packages.

14.     PURADD® FD-100 is not sold or used in the United States as an antiknock preparation.

15.     PURADD® FD-100 is not sold or used in the United States as an oxidation inhibitor.

16.     PURADD® FD-100 is not sold or used in the United States as an anti-icing preparation.

17.     PURADD® FD-100 is not sold or used in the United States as a gum inhibitor.

(Pretrial Order ("PTO"), Schedule C.)

**ISSUE PRESENTED**

Whether PURADD® FD-100 is properly classifiable in HTSUS tariff subheading

3811.90.00 or under tariff subheading 3902.20.50.

The two HTSUS tariff subheadings at issue provide in relevant part:

<u>Chapter 38</u>
| | |
|---|---|
| 3811 | Antiknock preparations, oxidation inhibitors, gum inhibitors, viscosity improvers, anti-corrosive preparations and other prepared additives, for mineral oils (including gasoline) or for other liquids used for the same purposes as mineral oils: |
| | . . . |
| 3811.90.00 | Other  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1.5¢/kg + 9.3% |

<u>Chapter 39</u>
| | | |
|---|---|---|
| 3902 | Polymers of propylene or of other olefins, in primary forms: | |
| | . . . | |
| 3902.20 | | Polyisobutylene: |
| | . . . | |
| 3902.20.50 | | Other  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6.5% |
| | . . . | |

**PARTIES' CONTENTIONS**

At the Court's request, the parties submitted post-trial briefs.  The positions of the parties

as set forth in their respective briefs are summarized below.

**I.      Plaintiff's Contentions**

Plaintiff's position is that PURADD® FD-100 is properly classifiable only in tariff

subheading 3902.20.50.  Plaintiff identifies three requirements that must be met in order for

PURADD® FD-100 to be classifiable in HTSUS heading 3902: the imported article must be

"(A) a polymer, (B) of propylene or other olefin, and (C) in primary form." (Pl.'s Post Trial Br. ("Pl.'s PT Br.") at 7.) Plaintiff explains that PURADD® FD-100 is a polymer because "PIBA has three different constituent monomer units, one of which repeats 16 times." (Id.) Plaintiff next submits that PIBA is a form of the olefin polyisobutylene. In support of its position, Plaintiff points out that polyisobutylene is an eo nomine subheading under HTSUS heading 3902. (Id. at 9.) Plaintiff also notes that the Explanatory Notes[6] ("EN") include slightly polymerized polisobutylene in heading 3902. (Id.) Plaintiff offers that PIBA is slightly polymerized polyisobutylene and, therefore, is classifiable in heading 3902. (Id.) Although the parties agreed that PURADD® FD-100 is in primary form, Plaintiff mentions that PURADD® FD-100 satisfies the HTSUS Chapter 39 note 6 definition of "primary form" because PURADD® FD-100 is a liquid. (Id. at 12.)

Plaintiff also maintains that none of the Chapter 39 notes acts to preclude the classification of PURADD® FD-100 in heading 3902. Plaintiff contends that Chapter 39 note 2(d) "only excludes such solutions where the solvent, rather than the polymer, exceeds fifty percent of the weight of the solution, or where the solvent is not volatile and organic." (Id. at 7.) Plaintiff points out that the parties stipulated that the saturated hydrocarbon solvent does not exceed fifty percent (50%) by weight of PURADD® FD-100. (Id. at 8.) Plaintiff offers that testimony submitted during trial confirms that the saturated hydrocarbon solvent is both volatile

_____

[6]The Harmonized Tariff System Explanatory Notes are a non-binding aid to assist a court in determining the scope of tariff headings. "While these notes are not controlling legislative history, they are nonetheless intended to clarify the scope of HTSUS subheadings and to offer guidance in their interpretation." Len-Ron Mfg. Co., Inc. v. United States, 334 F.3d 1304, 1309 (Fed. Cir. 2003). The EN may be persuasive authority when an article is specifically enumerated or, conversely, when an article is specifically excluded. See, e.g., Bausch & Lomb, Inc. v. United States, 21 CIT 166, 174-75, 957 F. Supp. 281 (1997).

and organic, which Plaintiff indicates Defendant admitted during the summary judgment portion of these proceedings. (Id. at 8-9.) Plaintiff states that one of its witnesses confirmed that PURADD® FD-100 satisfies the distillation test in Chapter 39 note 3(a). (Id. at 10-11.) Plaintiff also notes that PURADD® FD-100 meets the requirements of Chapter 39 note 3(c). (Id. at 11.)

Plaintiff also addresses the EN exclusion from heading 3902 of "[p]repared additives for mineral oils." EN Ch. 39, Vol. 2, p.718 (3rd ed. 2002). Plaintiff argues that nothing is added to PURADD® FD-100 or to the PIBA. (Id. at 13.) Rather, Plaintiff explains that the saturated hydrocarbon solvent is added to GLISSOPAL® 1000, the polyisobutylene used as the base for PURADD® FD-100. (Id.) Plaintiff maintains that the presence of the saturated hydrocarbon solvent does not alter "PIBA's chemical structure or its performance as a component in the deposit control additive packages created by [P]laintiff in the U.S." (Id. at 14.) Plaintiff insists that there is "no evidence or testimony to establish that the presence of the saturated hydrocarbon solvent makes the imported product a 'prepared additive' for gasoline." (Id.) Thus, Plaintiff asserts that because PURADD® FD-100 cannot be classified in HTSUS heading 3811 the EN exclusion does not apply. (Id.)

Plaintiff advances its argument by pointing out that PIB comprises more than ninety-five percent (95%) by weight of the total polymer content of PURADD® FD-100. (Id. at 18.) Therefore, Plaintiff insists that classification in the eo nomine HTSUS tariff subheading 3902.20.50 is legally correct. (Id.)

To counter Defendant's proposed classification of PURADD® FD-100 in HTSUS tariff subheading 3811.90.00, Plaintiff submits that "(A) PURADD® FD-100 is not a 'prepared additive' for gasoline, (B) it is not used as a prepared additive for gasoline, and (C) the decision

in Mitsui Petrochemicals (Am.), Ltd. v. United States, 21 CIT 882 (1997) is inapposite to the facts at hand." (Id. at 19.)

Plaintiff asserts that in order "for something to be classified as a prepared additive for gasoline, that product in its condition as imported must have been made 'ready beforehand' to be a substance that is added to gasoline for the specific purpose of improving, strengthening or altering it somehow." (Id. at 20.) Plaintiff also asserts that "the gasoline additives industry defines the phrase 'prepared additive for gasoline' as 'something that can go [directly] into gasoline.'" (Id. at 21 (quoting Trial Tr. 212-13).) Plaintiff submits that PURADD® FD-100 is not added directly to gasoline but rather is first blended with other components to create a DCA package. (Id. at 21.) According to Plaintiff, Defendant did not refute this point. (Id.) Plaintiff also maintains that PURADD® FD-100 is not a detergent because it is not a preparation "'used to keep the carburettor [sic] and the inflow and outflow of the cylinders clean.'" (Id. at 22 (quoting EN 38.11 at p.688).) Plaintiff claims that only DCA packages can act as detergents in the United States due to EPA regulations. (Id. at 23.) Further, Plaintiff posits that "prepared additives used to impart detergency in gasoline are those that in fact 'may be added to gasoline,' either separately or in combination with other chemicals such as carrier oil." (Id.) Plaintiff argues that PURADD® FD-100 may not be added directly to gasoline because to do so would be in violation of EPA regulations and might lead to harmful valve sticking or other engine malfunction. (Id.)

Plaintiff next submits that HTSUS tariff heading 3811 is a "use" provision. (Id. at 24.) As such, Plaintiff explains that PURADD® FD-100 must meet certain criteria in order to be classifiable in the heading. (Id.) Plaintiff concludes that PURADD® FD-100 is "not in the same

class or kind as 'other prepared additives' that can impart detergency into gasoline," and therefore, PURADD® FD-100 cannot be classifiable in heading 3811.  (Id. at 29.)  In support of its position, Plaintiff claims that evidence presented at trial demonstrates that "the expectations of the ultimate purchasers of PURADD® FD-100 differ from that of the ultimate purchaser of the detergent additive packages;" "PURADD® FD-100 and detergent additive packages move through different channels of trade;" "the environment of the sale of PURADD® FD-100 demonstrates that it is not used in its imported condition to impart detergency into gasoline;" "the imported merchandise is used differently than prepared additives for gasoline that impart detergency;" "PURADD® FD-100 cannot be economically used as a detergent or any other form of prepared additive for gasoline;" and "the industry recognizes that PURADD® FD-100 is not used as a prepared additive for gasoline."  (Id. at 25-29.)

Lastly, Plaintiff counters Defendant's argument that PURADD® FD-100 should be classified as an incomplete or unfinished prepared additive for gasoline pursuant to General Rule of Interpretation ("GRI") 2(a) of the HTSUS.  (Id. at 35.)  Plaintiff contends that "if application of GRI 1 provides the proper classification for imported merchandise, then this Court may not consider any subsequent GRIs."  (Id.)  Plaintiff posits that PURADD® FD-100 is classifiable in HTSUS tariff heading 3902 by operation of GRI 1, and PURADD® FD-100 is not classifiable in HTSUS tariff heading 3811 because it does not satisfy the terms of the heading or chapter notes. (Id. at 35-36.)  Because Plaintiff concludes that PURADD® FD-100 is not prima facie classifiable in heading 3811, Plaintiff reasons that it is improper for the Court to consider whether PURADD® FD-100 is classifiable in heading 3811 by operation of GRI 2(a).  (Id. at 36.)  Plaintiff also notes that articles classifiable in Section VI of the HTSUS, where heading

3811 falls, are not normally classified on the basis of GRI 2(a).  (Id.)  Lastly, Plaintiff insists that because PURADD® FD-100 is a "complete, finished and discrete article of commerce at the time of importation," it cannot be considered incomplete or unfinished for classification purposes.  (Id.)

As an alternative, Plaintiff suggests that PURADD® FD-100 may be classifiable in HTSUS tariff subheading 3911.90.90.[7]  (Id. at 38.)


## II.     Defendant's Contentions

Defendant claims that the correct classification for PURADD® FD-100 is in HTSUS tariff subheading 3811.90.00.  Defendant reasons that the provision for "other prepared additives, for mineral oils (including gasoline)" in heading 3811 includes all additives that are specifically prepared for use in gasoline; the relevant language of the heading is not limited to DCA packages.  (Def. U.S.'s Proposed Findings of Fact & Conclusions of Law ("Def.'s PT Br.") at 2.)  Defendant adduces its position in part from the definition of "detergent additive package" set forth by the EPA:

> Detergent additive package means any chemical compound or combination of chemical compounds, including carrier oils, that may be added to gasoline, or to post-refinery component blended with gasoline, in order to control deposit formation.  Carrier oil means an oil that may be added to the package to mediate or otherwise enhance the detergent chemical's ability to control deposits.  A detergent additive package may contain non-detergent-active components such as corrosion inhibitors, antioxidants, metal deactivators, and handling solvents.

---

[7]The Court heard no testimony and received no evidence to support Plaintiff's alternative classification.  Thus, the Court is unable to determine the applicability of Plaintiff's alternative classification.

(Id. at 2-3 (quoting 40 C.F.R. § 80.140 (2005) (emphasis in original).)  From this definition, Defendant postulates that PURADD® FD-100 may be considered a detergent additive package "because a 'package means any chemical compound' and does not require a combination of compounds in order to be a detergent additive package."  (Id. at 3 (quoting 40 C.F.R. § 80.140.) In addition, Defendant notes that the presence of non-detergent-active components is not necessary for a product to be designated by EPA as a detergent additive package.  (Id.) Defendant also comments that the "FD" in PURADD® FD-100 stands for "fuel detergent."  (Id.) Defendant posits that the "narrow range of molecular weights" of PURADD® FD-100 "makes it particularly well suited to function as a gasoline detergent."  (Id.)  Thus, Defendant reasons that PURADD® FD-100 is classifiable in HTSUS tariff subheading 3811.90.00 as a prepared additive for gasoline by operation of GRI 1.  (Id. at 4.)

Defendant alternatively argues that PURADD® FD-100 is classifiable in heading 3811 by operation of GRI 2(a) as "an unfinished or incomplete form of a prepared additive for gasoline." (Id.)  Defendant states that "[i]nsofar as fuel additives for gasoline are also referred to as 'deposit control additive packages,' it is implicit in that description that the detergent provides the identifying characteristic to such packages and therefore gives them their essential character." (Id.)  For similar reasons, Defendant suggests that "the Government should prevail under an essential character analysis by application of GRI 3(b), as well."  (Id.)

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(a) (2000).

STANDARD OF REVIEW

This Court reviews Customs' classification determinations de novo. See 28 U.S.C.

§ 2640(a)(1) (2000) (stating that in cases contesting the denial of a protest, the Court makes "its

determinations upon the basis of the record before the court"); see also Cargill, Inc. v. United

States, 28 CIT __, 318 F. Supp. 2d 1279, 1287 (2004). "Accordingly, the Court must determine

'whether the government's classification is correct, both independently and in comparison with

the importer's alternative.'" Cargill, 318 F. Supp. 2d at 1287 (quoting Jarvis Clark Co. v. United

States, 733 F.2d 873, 878 (Fed. Cir. 1984)).

The Court gives Chevron deference[8] to Customs' interpretations of tariff terms in

regulations but not those interpretations found in classification rulings. Carl Zeiss, Inc. v. United

States, 195 F.3d 1375, 1378 (Fed. Cir. 1999). See also Warner-Lambert Co. v. United States,

425 F.3d 1381, 1384 (Fed. Cir. 2005) ("Customs classification rulings are not accorded Chevron

deference."). Although not entitled to deference, a Customs classification decision may be

entitled to some weight.

> [Agency] rulings, interpretations and opinions . . . constitute a body of experience
> and informed judgment to which courts and litigants may properly resort for
> guidance. The weight of such a judgment in a particular case will depend upon
> the thoroughness evident in its consideration, the validity of its reasoning, its
> consistency with earlier and later pronouncements, and all those factors which
> give it power to persuade, if lacking power to control.

_____

[8]See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). "If a statute is ambiguous, and if the implementing agency's construction is reasonable, Chevron requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., __ U.S. __, 125 S. Ct. 2688, 2699, (citing Chevron, 467 U.S. at 843-44).

Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).  "Customs classification rulings are entitled

to a respect proportional to [their] power to persuade, but the Court has an independent

responsibility to decide the legal issue regarding the proper meaning and scope of the HTSUS

terms."  Simon Mktg., Inc. v. United States, 29 CIT __, 395 F. Supp. 2d 1280, 1286 (2005)

(bracketing in original) (quotations & citations omitted).


## DISCUSSION

"Plaintiffs in a classification case are faced with two hurdles in order to prevail: (1)

deference to an agency's reasonable interpretation of the statute it administers; and (2) the

statutory presumption, found in 28 U.S.C. Sec. 2639, that Customs's decisions have proper

factual basis unless the opposing party proves otherwise."  E.M. Chems. v. United States, 20 CIT

382, 385 (1996) (quotation & citations omitted).  In this case, Defendant is not entitled to the

statutory presumption of correctness because the classification Customs required at

entry–3811.19.00–was admittedly in error.  See Tomoegawa USA, Inc. v. United States, 12 CIT

112, 114, 681 F. Supp. 867 (1988), aff'd in part, 861 F.2d 1275 (Fed. Cir. 1988); Universal

Elecs., Inc. v. United States, 20 CIT 337, 338 (1996), aff'd, 112 F.3d 488 (Fed. Cir. 1997) ("This

presumption of correctness does not attach to Customs' classification, however, when Customs

admits that its classification is erroneous.").  See also HQ 964310.

Determining the correct classification of a good is a two-step process.  Orlando Food

Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998).  In the first step, the Court

determines the legal question of "the proper meaning of the tariff provisions."  Id.  In the second

step, the Court determines "whether merchandise falls within a particular tariff provision," which

is a question of fact.  Id.  When construing tariff terms, the court may look to common and commercial meanings.  The Mead Corp. v. United States, 283 F.3d 1342, 1346 (Fed. Cir. 2002).  To ascertain the common meaning of a tariff term, the court may refer to dictionaries, scientific authorities, and similarly reliable resources.  Id.  The Court may also look to the EN for guidance.  Len-Ron Mfg. Co., Inc. v. United States, 334 F.3d 1304, 1309 (Fed. Cir. 2003).

Tariff classification is governed by the HTSUS GRIs and the Additional U.S. Rules of Interpretation ("AUSRI").  Orlando Food, 140 F.3d at 1439.  The GRIs "are considered statutory provisions of law for all purposes."  Toy Biz, Inc. v. United States, 26 CIT 816, 819, 219 F. Supp. 2d 1289 (2002).  The Court applies the GRIs in numerical order.  Carl Zeiss, 195 F.3d at 1379.

GRI 1 requires that the Court determine classification "according to the terms of the headings and any relative section or chapter notes."  To apply GRI 1, the Court must construe "the language of the heading, and any section or chapter notes in question, to determine whether the product at issue is classifiable under the heading."  Orlando Food, 140 F.3d at 1440.  The Court must identify the proper heading or headings in which an article is classifiable before it can determine the subheading that provides the classification for the item.  Id.  Only when application of GRI 1 does not resolve a classification question may the Court proceed to the remaining GRIs.  Simon Mktg., 395 F. Supp. 2d at 1287.

GRI 2(a) instructs that a heading must be understood to include incomplete and unfinished importations of the articles it covers provided the imported article has the "essential character" of the complete or finished article.  GRI 2(b) then requires that goods consisting of more than one material or substance be classified in accordance with GRI 3.

GRI 3 governs the classification of goods that are prima facie classifiable under two or more headings. GRI 3(a) states that "[t]he heading which provides the most specific description shall be preferred to headings providing a more general description." This is known as the rule of "relative specificity." Carl Zeiss, 195 F.3d at 1380.

In applying these rules, as explained below, this Court holds that PURADD® FD-100 is classifiable in HTSUS tariff heading 3811, specifically subheading 3811.90.00.


**I.      HQ 964310 Is Persuasive But Not Controlling.**

In 2001, Customs issued HQ 964310 revoking HQ 956585 and classifying PURADD® FD-100 in HTSUS tariff subheading 3811.90.00. This Court must decide, pursuant to the factors outlined in Skidmore, what weight to give this ruling. As a Headquarters ruling, the Court takes notice that it was prepared by an attorney and provides legal justification and explanation for the classification Customs adopted. Because HQ 964310 revoked an existing classification ruling, it was also the subject of public notice and comment.[9] However, this Court finds the analysis in

_____

[9]The Court notes that the only comment Customs received to the notice of proposed ruling revocation was from BASF. HQ 964310.

HQ 964310 incomplete.[10]  As a result, this Court gives some persuasive effect to HQ 964310 but

does not rely upon it entirely in deciding the classification of PURADD® FD-100.[11]

It is also appropriate for this Court to give less weight to a Customs decision when the

decision announces a change in the agency's position.  See Cal. Indus. Prod., Inc. v. United

States, 28 CIT __, 350 F. Supp. 2d 1135, 1140-41 (2004), aff'd, __ F.3d __, No. 05-1087, 2006

WL 229922 (Fed. Cir. Feb. 1, 2006).

> While Customs may change a view it believes to have been grounded upon a
> mistaken legal interpretation, the consistency and predictability of an agency's
> position is a factor in assessing the weight that position is due.  See Good
> Samaritan Hosp. v. Shalala, 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368
> (1993) (citing Auto. Club of Mich. v. Commissioner, 353 U.S. 180, 180-83,
> 77 S.Ct. 707, 1 L.Ed.2d 746 (1957)).  "An agency interpretation of a relevant
> provision which conflicts with the agency's earlier interpretation is 'entitled to
> considerably less deference' than a consistently held agency view."  INS v.
> Cardoza-Fonseca, 480 U.S. 421, 448, n.30, 107 S.Ct. 1207, 94 L.Ed.2d 434

---

[10]This Court finds Customs' analysis in HQ 964310 incomplete for several reasons.
Among the reasons for incompleteness are the following.  Customs failed to fully explain why
PURADD® FD-100 satisfies the heading, section, and chapter notes for heading 3811.  In
addition, Customs determined without complete explanation that PURADD® FD-100 was not
classifiable under heading 3902 based on GRI 1.  Further, Customs–again without complete
explanation–concluded that "PURADD® FD-100 is an unfinished product."  HQ964310.  Using
a GRI 2(a), Customs then determined that PURADD® FD-100 provides the essential character
for the unfinished PURADD® FD-100 product.  For this Court to defer to Customs'
classification decision, it must be more than reasoned; it must be well-reasoned.

[11]The Court finds interesting Plaintiff's reliance on NY 872123 (Apr. 22, 1992) in support
of its contention that PURADD® FD-100 cannot be classified in HTSUS heading 3811.  In NY
872123, Customs classified an amine-based polyether, which Plaintiff states is similar to
PURADD® FD-100 (id. at 23), in HTSUS tariff subheading 3907.20.00, a classification for
"other polyethers."  Customs' classification in NY 872123 is without explanation or analysis.
Thus, the Court is disinclined to give it any deference.  See Cargill, 318 F. Supp. 2d at 1287.
However, Plaintiff would have this Court give no deference to the reasoned–albeit
incomplete–ruling HQ 964310 but rely upon NY 872123, which is devoid of analysis.  Plaintiff
cannot pick and choose at its convenience and without justification the Customs rulings to which
the Court should give deference.

(1987) (emphasis added) (quoting <u>Watt v. Alaska</u>, 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981)).

<u>Id.</u> at 1140-41 (footnote omitted) (emphasis added).  Because HQ 964310 announced a change in Customs' position with regard to the classification of PURADD® FD-100, it is owed less weight by this Court.  The Court also notes that it has "an independent responsibility to decide the legal issue regarding the proper meaning and scope of the HTSUS terms."  <u>Simon Mktg.</u>, 395 F. Supp. 2d at 1286 (quotation & citation omitted).

For the foregoing reasons, this Court finds that–while it has some power to persuade–HQ 964310 does not control the outcome of this case.

## II.      **PURADD® FD-100 is *Prima Facie* Classifiable in HTSUS Tariff Heading 3902.**

As stated above, GRI 1 requires that classification is to be determined "according to the terms of the headings and any relative section or chapter notes."  In order to be classifiable in HTSUS heading 3902, PURADD® FD-100 must be (1) a polymer, (2) of propylene or other olefin, and (3) in primary form.

A polymer "consist[s] of molecules which are characterised [sic] by the repetition of one or more types of monomer units."  EN Ch. 39 at p.712.  Plaintiff's witness, Dr. Fehr who has a Ph.D. in chemistry, testified that PURADD® FD-100 has three different monomer units, one of which repeats sixteen times.  (Trial. Tr. 54.)  The Customs National Import Specialist who also testified at trial agreed that PURADD® FD-100 is a chemically modified polymer.  (<u>Id.</u> at 325.) Further, Defendant's expert, Dr. Crawford, referred to PURADD® FD-100 as a "detergent-active

polymer." (Id. at 332 (emphasis added).) Thus, this Court is persuaded that PURADD® FD-100 is a polymer.

Next, the Court must determine whether PURADD® FD-100 is an olefin. An "olefin" is "[a] family of unsaturated, chemically active hydrocarbons with one carbon-carbon double bond; includes ethylene and propylene." McGraw-Hill Dictionary of Scientific and Technical Terms 1468 (6th ed., E. Geller ed., McGraw-Hill 2003) ("McGraw-Hill"). Olefins "are named after the corresponding paraffins by adding -ene or -ylene to the stem." Hawley's Condensed Chemical Dictionary 817 (14th ed., R. J. Lewis, Sr., ed., John Wiley & Sons, Inc. 2001) ("Hawley's"). The EN define "liquid synthetic polyolefins" as "polymers obtained from ethylene, propene, butenes or other olefins." EN Ch. 39 at p.714 (emphasis added). PIB is an eo nomine provision under heading 3902, which indicates to the Court that PIB is an olefin. In addition, the Court heard testimony that PURADD® FD-100 "is obtained by synthesis from isobutene" which is an olefin as apparent from the -ene ending and based on the EN definition of polyolefins. (Trial Tr. 49 (emphasis added).) Therefore, PURADD® FD-100 satisfies the second criteria for classification in heading 3902.

Lastly, to be classifiable under the terms of heading 3902, PURADD® FD-100 must be in "primary form." HTSUS Chapter 39 note 6 defines "primary forms" as "[l]iquids and pastes, including dispersions (emulsions and suspensions) and solutions" and "[b]locks of irregular shape, lumps, powders (including molding powders), granules flakes and similar bulk forms." The Court notes that in its imported condition PURADD® FD-100 is a liquid. (See PTO, Schedule C, ¶ 4; Trial Tr. 57.) Moreover, the parties agreed that PURADD® FD-100 is in

primary form.  (PTO, Schedule C, ¶ 6.)  Accordingly, the Court finds that PURADD® FD-100 is

in primary form and satisfies the terms of HTSUS tariff heading 3902.

After reviewing the terms of the heading, the Court also must consider any applicable

section and chapter notes.  The notes "have the same legal force as the text of the headings."

Trans-Border Customs Servs., Inc. v. United States, 18 CIT 22, 25, 843 F. Supp. 1482 (1994).

The purpose of the notes is "to define the precise scope of each heading, subheading, chapter,

subchapter, and section."  Id. at 26.  The Court finds several chapter notes applicable to HTSUS

heading 3902.

HTSUS Chapter 39 note 2(d) excludes from classification in the heading "[s]olutions . . .

consisting of any of the products specified in headings 3901 to 3913 in volatile organic solvents

when the weight of the solvent exceeds 50 percent of the weight of the solution."  The parties

agreed that PURADD® FD-100 is comprised of less than fifty percent (50%) by weight of the

saturated hydrocarbon solvent.  (PTO, Schedule C, ¶ 7.)  Additionally, Dr. Fehr, Plaintiff's

witness, testified that "volatile organic solvents" and "inert saturated hydrocarbons" are the same.

(Trial Tr. 173-74.)  Thus, PURADD® FD-100 is not precluded from classification in HTSUS

Chapter 39 by operation of chapter note 2(d).

In addition, HTSUS Chapter 39 note 3 requires that goods classifiable in heading 3902

satisfy a distillation test for "[l]iquid synthetic polyolefins of which less than 60 percent by

volume distills at 300°C, after conversion to 1,013 millibars when a reduced-pressure distillation

method is used (headings 3901 and 3902)."[12]  As previously stated, the EN define "liquid

---

[12]The Court does not accept Plaintiff's assertion that PURADD® FD-100 need not meet
the distillation test to be classifiable in heading 3902.  (Pl.'s PT Br. at 10.)  Plaintiff suggests that
(continued...)

synthetic polyolefins" as "polymers obtained from ethylene, propene, butenes or other olefins."

EN Ch. 39 at p.714.  Dr. Fehr confirmed that PURADD® FD-100 satisfies the definition of

"liquid synthetic polyolefins" because "it is a liquid and the polymer PIBA is obtained by

synthesis from isobutene," which is an olefin.  (Trial Tr. 49.)  Dr. Fehr also testified that

PURADD® FD-100 satisfies the distillation test set forth in HTSUS Chapter 39 note 3(a).  (Id. at

49, 54, 58.)

It is worth mentioning that the EN specifically include in heading 3902

"[p]olyisobutylene, slightly polymerised [sic] and meeting the requirements of Note 3(a) to this

Chapter."  EN 39.03 at p.725.  Plaintiff's witness testified that PIBA is a polymer, specifically "a

slightly polymerized PIB."  (Trial Tr. 48.)  Defendant's witness agreed with this characterization.

(Id. at 324-25.)

Based upon the foregoing analysis, it appears that PURADD® FD-100 is classifiable in

HTSUS heading 3902.  However, the Court has yet to consider whether HTSUS tariff

subheading 3902.20–an eo nomine provision for polyisobutylene–covers PURADD® FD-100.

The subject merchandise is not simply polyisobutylene but rather a mixture of polyisobutylene-

amine and a saturated hydrocarbon solvent.  As such, subheading 3902.20 describes only part of

PURADD® FD-100.

---

[12](...continued)
it is sufficient that PURADD® FD-100 satisfy HTSUS Chapter 39 note 3(c), which permits
classification of "[o]ther synthetic polymers with an average of at least five monomer units" in
heading 3901 through 3911.  Plaintiff's argument appears misguided.  The parenthetical in
Chapter 39 note 3(a) indicates that satisfaction of the distillation test is a requirement for goods
to be classifiable in headings 3901 and 3902.

Plaintiff argues that "[u]nless there is evidence of contrary legislative intent, an <u>eo nomine</u> provision naming an article without terms of limitation [] is deemed to include all forms of the article." <u>E.T. Horn Co. v. United States</u>, Slip Op. 03-20, 2003 WL 649080, at *7 (CIT Feb. 27, 2003) (quotation & citation omitted), <u>aff'd</u>, 367 F.3d 1326 (Fed. Cir. 2004). (<u>See also</u> Pl.'s PT Br. at 18.) "[A]lthough an <u>eo nomine</u> provision covers all forms and varieties of the named commodity, there is a point where the addition of parts and functions transforms the object into something else." <u>Am. Hardboard Ass'n v. United States</u>, 12 CIT 714, 716 (1988). The Court finds that PURADD® FD-100 has not reached the point at which the product is no longer covered by HTSUS 3902.

Chapter 39 subheading note 1(a) dictates the classification of polymers in headings–such as 3902–that contain a classification breakout for "other." Pursuant to the note, "[t]he designation in a subheading of a polymer by the prefix 'poly' (e.g., polyethylene and polyamide-6,6) means that the constituent monomer unit or monomer units of the named polymer taken together must contribute 95 percent or more by weight of the total polymer content." Ch. 39 HTSUS, subheading n.1(a)(1). During trial, Plaintiff's witness Dr. Fehr testified that "PIB constitutes 97.01 percent by weight of the PIBA." (Trial Tr. 55.) Because PIB constitutes more than ninety-five percent (95%) of the weight of PURADD® FD-100, the addition of the amine tail does not disqualify the product from classification in HTSUS heading 3902.

The Court accepts Dr. Fehr's testimony that the solvent "has no impact on the PIBA's chemical structure or its performance as a detergent[-]active component in prepared additive packages for gasoline." (<u>Id.</u> at 47; <u>see also</u> <u>id.</u> at 342, 347.) Further, Chapter 39 note 2(d) contemplates that solutions that satisfy the note's requirements are classifiable in the chapter. As

such, it appears that PIBA in saturated hydrocarbon solvent is simply another form of PIBA.

Therefore, the presence of the solvent also does not disqualify PURADD® FD-100 from

classification in HTSUS heading 3902.

Accordingly, the Court finds that PURADD® FD-100 is prima facie classifiable in

HTSUS heading 3902.  The Court nonetheless must decide whether Customs' proposed

classification of PURADD® FD-100 in HTSUS heading 3811 is also legally correct, for, as

GRI 3 contemplates, an imported article may be prima facie classifiable in two or more headings

of the HTSUS.

**III.    PURADD® FD-100 is *Prima Facie* Classifiable in HTSUS Tariff Heading 3811.**

For the reasons that follow, this Court finds that PURADD® FD-100 is classifiable in

HTSUS tariff heading 3811 by operation of GRI 1.  Consequently, this Court need not and does

not consider whether PURADD® FD-100 is classifiable in HTSUS heading 3811 based upon

GRI 2(a).

A.      Terms of heading and notes (GRI 1)

Pursuant to GRI 1, classification is "determined according to the terms of the headings

and any relative section or chapter notes."  The relevant portion of HTSUS tariff heading 3811

states that "other prepared additives, for mineral oils (including gasoline)" are included within

the heading.  In order for PURADD® FD-100 to be classifiable in heading 3811, this Court must

find that it is 1) prepared, 2) an additive, and 3) for gasoline.[13]  This Court finds that PURADD®

FD-100 is a prepared additive for gasoline.

The terms "prepared additive" and "for gasoline" are defined neither by the HTSUS nor

the legislative history for the provision.  When tariff terms are not defined, the Court may look to

common and commercial meanings to ascertain the meaning of these terms.  Mead, 283 F.3d at

1346.  To aid in its decision, this Court refers to dictionaries, scientific authorities, and similarly

reliable resources.  Id.  The Court may also refer to the EN for guidance.  Len-Ron, 334 F.3d at

1309.


### 1.     PURADD® FD-100 is "prepared."

The Oxford English Dictionary ("OED") defines "prepared" as "[m]ade ready, got ready,

fitted or put in order beforehand for something" or "[t]reated for some purpose by a special

process; made or compounded by a special process."  XII The Oxford English Dictionary 376 (2d

ed., J. A. Simpson & E. S. C. Weiner eds., Clarendon Press 1989) ("OED").  "Prepared" may

also mean "subjected to a special process or treatment."  Webster's New Collegiate Dictionary

901 (H. B. Woolf ed., G. & C. Merriam Co. 1981).  By comparison, the verb "prepare" means

"[t]o make ready beforehand for a specific purpose," "[t]o put together or make by combining

various elements or ingredients; manufacture or compound."  The American Heritage Dictionary

---

[13]None of the Section or Chapter notes precludes the classification of PURADD®
FD-100 in HTSUS heading 3811.  Therefore, if PURADD® FD-100 satisfies the terms of the
heading, it is classifiable therein by operation of GRI 1.

of the English Language 1430 (3d ed., A. H. Soukhanov ed., Hougton Mifflin Co. 1996)

("American Heritage").[14]

Based upon these definitions and the testimony provided at trial, it is apparent to this

Court that PURADD® FD-100 is "prepared." (Trial Tr. at 44-45 (describing manufacturing

process), 107, 116.) BASF manufactures PURADD® FD-100 through a series of "rigorous

chemical transformations." (Id. at 342, 358.) The manufacturing process first requires a reaction

under pressure and at high temperature to create an "oxo product." (Id. at 341.) Next, BASF

subjects the oxo product to a reaction–again at high temperature and high pressure–to add the

amine tail. (Id. at 342.) The end result is PURADD® FD-100. (Id.) This process is designed to

make PURADD® FD-100 ready for its specific purpose as a detergent-active component. (Id. at

174, 372, 394.) In other words, PURADD® FD-100 is made "ready beforehand for a specific

purpose," American Heritage 1430, and is "[t]reated for some purpose by a special process; made

or compounded by a special process," XII OED 376.

In addition, Dr. Fehr, Plaintiff's own witness, testified that "PURADD® FD-100 is a

prepared additive component" (Trial Tr. at 107 (emphasis added)) and "a prepared additive" (id.

at 116 (emphasis added)). Dr. Fehr also stated that "[PURADD® FD-100] is prepared" and that

PURADD® FD-100 is "a preparation." (Id. at 107 (emphasis added).) Further, Dr. Fehr avowed

that it was his understanding that PURADD® FD-100 "is a prepared additive under the

definition of the tariff code." (Id. at 117 (emphasis added).) Likewise, Plaintiff's expert, Mr.

Ketcham, testified that "[w]ithout a doubt [the components of DCA packages] are prepared

_____

[14]This Court also consulted several scientific and chemical dictionaries and found that
none had definitions for either "prepared" or "prepare." Thus, the Court concluded that–for
purposes of this case–the common meaning of these terms was relevant and probative.

additives." (Id. at 231 (emphasis added).) Based on trial testimony and upon reviewing the

common meanings of "prepared," this Court has no doubt that PURADD® FD-100 is

"prepared."

### 2.      PURADD® FD-100 is an "additive."

Next, this Court must consider whether PURADD® FD-100 is an additive. "Additive" is

A nonspecific term applied to any substance added to a base material in low
concentrations for a definite purpose. Additives can be divided into two groups:
(1) those that have an auxiliary or secondary function (antioxidants, inhibitors,
thickeners, plasticizers, flavoring agents, colorants, etc.) and (2) those that are
essential to the existence of the end product (leavening agents in bread, curatives
in rubber, blowing agents in cellular plastics, emulsifiers in mayonnaise,
polymerization initiators in plastics, and tanning agents in leather).

Hawley's at 21. An "additive" is also a "substance added to another to strengthen or otherwise

alter it for the purpose of improving the performance of the finished product." McGraw-Hill at

35. According to the OED, an "additive" is "[s]omething that is added; esp. (in various technical

uses) a substance added . . . in order to impart specific qualities to the resulting product." I OED

at 144. Further, the EPA defines "additive" as "any substance, other than one composed solely of

carbon and/or hydrogen, that is intentionally added to a fuel named in the designation (including

any added to a motor vehicle's fuel system) and that is not intentionally removed prior to sale or

use." 40 C.F.R. § 79.2(e) (2000).

BASF's own marketing practices indicate that PURADD® FD-100 is an additive. For

example, BASF markets and sells PURADD® FD-100 through its "Fuel Additives" business

unit. (Trial Tr. 291 (emphasis added).) In addition, BASF's product line description identifies

"BASF's PIBA" as part of its "complete line of fuel detergent <u>additives</u>."  (Def.'s Ex. P (emphasis added).)

Without question, PURADD® FD-100 is added to DCA packages to serve as the detergent-active component.  (PTO, Schedule C, ¶ 13.)  The EPA defines "detergent-active components" as "components of a detergent additive package which act to prevent the formation of deposits, including, but not necessarily limited to, the actual detergent chemical and any carrier oil (if present) that acts to enhance the detergent's ability to control deposits."  40 C.F.R. § 80.140.  In this context, PURADD® FD-100 is an additive that meets the second type of additive described in <u>Hawley's</u>–one essential to the existence of the end product–a DCA package.  As <u>the</u> detergent-active component of Plaintiff's DCA package, PURADD® FD-100 imparts the essential and specific detergency property to the DCA package.[15]  Moreover, Plaintiff's own witness, Dr. Fehr, admitted that PURADD® FD-100 is an additive.  (Trial Tr. 111, 116, 117.)  Likewise, Plaintiff's expert, Mr. Ketcham, testified that PIBAs are "detergent <u>additives</u>," (<u>id.</u> at 220 (emphasis added)), and are, in fact, "effective detergent <u>additive[s]</u>," (<u>id.</u> at 221(emphasis added)).  Moreover, PURADD® FD-100 is registered with the EPA as a gasoline additive.  (<u>Id.</u> at 112 ("[PURADD® FD-100] is registered so that someone can use it to add it into a gasoline."), 113 ("The PURADD® FD-100 is registered as a gasoline additive with the EPA."), 114; Def.'s Ex. L.)  Accordingly, this Court holds that PURADD® FD-100 is an additive.

---

[15]By its very nature, a DCA package is also an additive.  A DCA package is added to gasoline to "control deposit formation."  40 C.F.R. § 80.140.

>    3.     PURADD® FD-100 is "for gasoline."

Lastly, this Court must decide if PURADD® FD-100 is "for gasoline." The phrase "for

gasoline" in HTSUS tariff heading 3811 designates that the heading is a principal use provision.

> While some provisions expressly declare that classification of designated
> merchandise is dependent upon principal use, in most cases, principal use is
> implied from the language of the HTSUS. In other words, a designation by use
> may be established, although the word 'use' or 'used' does not appear in the
> language of the statute.

E.M. Chems., 20 CIT at 386 (quotation & citation omitted). "Use" may be implied from the

phrase "for gasoline," for without the implied term the statutory phrase has no meaning.

Accordingly, this Court finds that PURADD® FD-100 must be "for [use in] gasoline" to be

classifiable in tariff heading 3811.

Additional U.S. Rule of Interpretation ("AUSRI") 1(a) is statutory and governs tariff

classification of imported goods under use provisions. The rule states that

> tariff classification controlled by use (other than actual use) is to be determined in
> accordance with the use in the United States at, or immediately prior to, the date
> of importation, of goods of that class or kind to which the imported goods belong,
> and the controlling use is the principal use.

AUSRI 1(a) (emphasis added). "The purpose of 'principal use' provisions in the HTSUS is to

classify particular merchandise according to the ordinary use of such merchandise, even though

particular imported goods may be put to some atypical use." Primal Lite, Inc. v. United States,

182 F.3d 1362, 1364 (Fed. Cir. 1999).

At a minimum, AUSRI 1(a) requires a determination of (1) the "class or kind to which

the imported goods belong" and (2) the principal use of that class or kind of goods at or

immediately prior to the date of importation. "The scope of the 'class or kind' inquiry should be

narrowly tailored to 'the particular species of which the merchandise is a member.'" Brother

Int'l Corp. v. United States, 26 CIT 867, 874 n.7, 248 F. Supp. 2d 1224 (2002) (quoting Primal

Lite, 182 F.3d at 1364); see also USR Optonix, Inc. v. United States, 362 F. Supp. 2d 1365, 1381

(CIT 2005).  To determine the class or kind to which the imported goods belong, Customs must

determine the class of goods with which the imported goods are "commercially fungible."

Primal Lite, 182 F.3d at 1364, 1365; cf. United States v. Carborundum Co., 63 CCPA 98, 102,

536 F.2d 373 (1976)[16] ("Factors which have been considered by courts to be pertinent in

determining whether imported merchandise falls within a particular class or kind include the

general physical characteristics of the merchandise, the expectation of the ultimate purchasers,

the channels, class or kind of trade in which the merchandise moves, the environment of the sale

(i.e., accompanying accessories and the manner in which the merchandise is advertised and

displayed), the use, if any, in the same manner as merchandise which defines the class, the

economic practicality of so using the import, and the recognition in the trade of this use."

---

[16]This Court notes that Carborundum was decided prior to the introduction of the HTSUS.  The case interpreted statutory provisions of the predecessor to the HTSUS–the Tariff Schedules of the United States (TSUS).  While the TSUS rule at issue was similar to AUSRI 1(a), it was not identical:

> [A] tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of the articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined.

Carborundum, 63 CCPA at 101 (quoting TSUS General Interpretive Rule 10(e)(I)) (emphasis added).
Decisions under the TSUS are not controlling on decisions made under the HTSUS, but TSUS decisions are instructive when interpreting similar HTSUS provisions.  See E.M. Chems., 20 CIT at 386 n.5.

(citations omitted) (emphasis added)). "Susceptibility, capability, adequacy, or adaptability of the import to the common use of the class is not controlling." Carborundum, 63 CCPA at 102; see also Minnetonka Brands, Inc. v. United States, 24 CIT 645, 652, 110 F. Supp. 2d 1020 (2000); USR Optonix, 362 F. Supp. 2d at 1381.

The parties do not dispute that PURADD® FD-100 ultimately ends up in gasoline. However, the parties differ on the importance of the intervening process–the blending of the DCA package–that PURADD® FD-100 undergoes before it finds its way into gasoline. Plaintiff defines the class or kind of goods to which PURADD® FD-100 belongs as consisting of only DCA packages. (See, e.g., Pl.'s PT br. at 25.) On the other hand, Defendant takes a broader view of the class or kind of goods to which PURADD® FD-100 belongs. (See, e.g., Def.'s PT br. at 20.) Defendant seems to argue that PURADD® FD-100 should be considered as any of the other additives specifically enumerated in HTSUS heading 3811 (i.e., antiknock preparations, oxidation inhibitors, gum inhibitors, viscosity improvers, anti-corrosive preparations). (Id. at 19 ("These terms are prefaced by the word 'other,' thus signaling that the substances specified earlier in the heading text, for example, antiknock preparation, oxidation inhibitors, gum inhibitors, are also 'prepared additives for mineral oils (including gasoline.)'").)[17]

---

[17]Without stating so specifically, Defendant has made an ejusdem generis argument for the inclusion of PURADD® FD-100 in heading 3811.

It is well settled that when a list of items is followed by a general word or phrase, the rule of ejusdem generis is used to determine the scope of the general word or phrase. In classification cases, ejusdem generis requires that, for any imported merchandise to fall within the scope of the general terms or phrase, the merchandise must possess the same essential characteristics or purposes that unite the listed exemplars preceding the general term or phrase.

(continued...)

   Defendant notes that when PURADD® FD-100 is blended with the other components of

the DCA package it "retains its individual chemical identi[t]y in the blend, and could be

separated out yielding the same starting material if so desired." (Id. at 20.) Defendant cites to

testimony presented at trial in which Dr. Crawford (Defendant's expert witness) testified that

additives blended together to create a DCA package "retain their individual chemical identities in

the blend of additives and could be separated yielding the same starting materials if so desired."

(Trial Tr. 359; see also id. at 118.) Dr. Crawford also pointed out that blending the additives

neither forms new chemical bonds nor breaks existing bonds. (Id. at 359.)

   The EN for HTSUS heading 3811 define the class or kind of goods covered by the

heading as "additives for mineral oils . . . to eliminate or reduce undesirable properties, or to

impart or enhance desirable properties." EN 38.11 at p.687. PURADD® FD-100 satisfies this

definition because it both reduces undesirable properties and enhances desirable properties.

First, on its own, PURADD® FD-100 has detergent[18] properties, which "protect the intake

---

   [17](...continued)
Aves. in Leather, Inc. v. United States, 423 F.3d 1326, 1332 (Fed. Cir. 2005) (internal citations
omitted). However, the ejusdem generis principle does not apply if the "specific and primary
purpose" of the imported article "is inconsistent with that of the listed exemplars in a particular
heading." Id. (quotation & citation omitted).
   The EN for heading 3811 state that "[t]he preparations of this heading are additives for
mineral oils or for other liquids used for the same purposes to eliminate or reduce undesirable
properties, or to impart or enhance desirable properties." EN 38.11 at p.687. PURADD®
FD-100 is similar to the exemplars in heading 3811 and satisfies the EN description of the scope
of the heading in that PURADD® FD-100 is designed to and does provide detergency when
added to gasoline. (See Trial Tr. at 174-75, 344, 356; Def. Ex. K.)

   [18]The ENs for heading 3811 define "detergents" as "[p]reparations used to keep the
carburettor [sic] and the inflow and outflow of the cylinders clean." EN 38.11(A)(2)(d) at p.688.
In petroleum terminology, detergents are "to control carburetor and induction system
cleanliness." 2 Van Nostrand's Scientific Encyclopedia 2701 (9th ed., G. Considine ed., John
                                                                                    (continued...)

system by preventing the formation of deposits," "neutralize and disperse any deposit

precursors," and "remove deposits that have formed." (Trial Tr. 141-42.) Second, PURADD®

FD-100 may be combined with a carrier oil to optimize detergency. (Id. at 186 (PURADD®

FD-100 "adds detergency to the final product."), 190, 201.) Also, other DCA package

components, of which PURADD® FD-100 is one, are enumerated in HTSUS tariff heading

3811, including corrosion inhibitors and antioxidants. See also 40 C.F.R. § 80.140 (EPA

regulation defining detergent additive package as perhaps including non-detergent-active

components like corrosion inhibitors, antioxidants, metal deactivators, and handling solvents).

Ergo, PURADD® FD-100 falls within the class or kind of goods covered by HTSUS heading

3811.

This Court has traditionally reviewed the factors set forth in Carborundum, 536 F.2d at

377, when determining whether an imported article falls within a particular class or kind of

goods.[19]  Based on a review–in the context of this case–of the Carborundum factors, this Court

---

[18](...continued)
Wiley & Sons, Inc. 2002). This Court finds it difficult to define "detergent" in industry terms
because, as Dr. Fehr testified, "there is not a sharp definition between detergent component and
detergent additive package." (Trial Tr. 162.)

[19]This Court does not find the "commercially fungible" test adopted in Primal Lite, 182
F.3d at 1364, useful in this case. Although the Court heard testimony about products that
compete with PURADD® FD-100 (e.g., polyetheramines, polyoxyakyleneamines, Mannich base
products, and polyisobutenylsuccinimides) (Trial Tr. 348-49), this Court was not asked to
classify the competing products and was not provided with the tariff classifications of any of the
identified competing products. Therefore, comparing PURADD® FD-100 to commercially
fungible products does not elucidate the matter at hand.

again concludes that PURADD® FD-100 is a member of the class or kind of goods covered by

HTSUS heading 3811.[20]

First, PURADD® FD-100 has the physical characteristics of a chemical with detergency

properties. Indeed, Plaintiff's patent for PURADD® FD-100 indicates "that the PIBA material

from BASF is giving detergency in the engine." (Trial Tr. 146-48; see also id. at 343 ("The

patent teaches that [PIBA] product . . . functions as a gasoline detergent"), 356 ("The BASF

patent contains data demonstrating its efficacy as a detergent additive when used alone, without

the carrier, in unleaded gasoline."); Def.'s Ex. K.) As the detergent-active component of a DCA

package, PURADD® FD-100 "disperses deposit precursors and removes exhibiting deposits in

the intake system." (Trial Tr. 63-64.) Dr. Fehr stated that PURADD® FD-100 is manufactured

specifically for its "detergent aspect." (Id. at 174.) Mr. Ketcham, Plaintiff's expert, added that

the detergent-active component–PURADD® FD-100–in this instance–is "the most important"

component in preventing and cleaning engine deposits. (Id. at 205.) According to Mr. Ketcham,

PURADD® FD-100 is "a very good detergent." (Id. at 247.) In addition, Dr. Crawford,

Defendant's expert, pronounced that "PURADD® FD-100 is well known in the industry and

accepted as a gasoline detergent." (Id. at 335.) Dr. Crawford also testified that the chemical

structure of PURADD® FD-100, specifically a "hydrophobic tail with a polar head, namely

amino" (id. 344-45), is what gives the product its detergency capability. See also Id. at 365

---

[20]This Court does not take the view that an imported product is of the same class or kind as other products only if the imported product satisfies all of the Carborundum factors. Carborundum dictates that the Court look to "all the pertinent circumstances." Carborundum, 536 F.2d at 377 (emphasis added).

("PURADD® FD-100 already possesses, by virtue of its chemical structure, all the components necessary to function as a gasoline detergent.").

Second, BASF consumes nearly all[21] of the imported PURADD® FD-100 for its production of DCA packages. Gasoline marketers (e.g., Texaco and Chevron) then purchase BASF-formulated DCA packages, which have PURADD® FD-100 as the detergent-active component. The gasoline marketers expect that BASF's DCA packages will (1) "protect the intake system by preventing the formation of deposits," (2) "neutralize and disperse any deposit precursors," and (3) remove deposits that have formed." (Id. at 62.) Dr. Fehr admitted that PURADD® FD-100 alone can "protect the intake system by preventing the formation of deposits," "neutralize and disperse any deposit precursors," and "remove any deposits that have formed." (Id. at 141-42.) As such PURADD® FD-100, at a minimum, meets BASF's customer expectations for its function as a detergent-active component of a DCA package.

Third, PURADD® FD-100 moves in the same channels of trade as other detergent additives. Dr. Crawford testified that other detergent additives compete with PURADD® FD-100. (Trial Tr. 348-9.) However, the competing products all have differing chemical structures, but each provides detergency to unleaded gasoline. (Id. at 349-50.)

Fourth, the environment of sale factor seems inapplicable in this case because PURADD® FD-100 is not sold in its imported condition but is consumed by BASF in DCA package blending. Were PURADD® FD-100 to be sold, this Court presumes it would be sold in much the same manner as the competing detergent additives. Fifth, PURADD® FD-100 is used

---

[21]The Court recognizes that BASF had "very small sales" of PURADD® FD-100 during an unspecified period to customers outside the fuel area. (Trial Tr. 257.) For purposes of a principal use analysis, these anomalous sales are irrelevant.

as a detergent additive, specifically as the detergent-active component. Sixth, PURADD®

FD-100 is blended with other components before being added to gasoline because it is more

economically practical to do so. (Trial Tr. 126-27, 225-26.) However, the various components

of a DCA package, including the detergent-active component (i.e., PURADD® FD-100) may be

added directly to gasoline. (Id. at 126-27, 225-26, 230-31, 360-61.) Seventh, PURADD®

FD-100 is recognized by the EPA as both a gasoline additive and detergent-active component.

(Id. at 111, 113, 332; Def's Ex. L.)

   This Court's conclusion is not contrary to the established rule in customs jurisprudence

that the court must classify articles based upon their condition as imported. United States v.

Bernard Citroen, 223 U.S. 407, 414-15 (1912). Although PURADD® FD-100 may not satisfy

either EPA regulations or customer specifications for a DCA package, the record is clear that

PURADD® FD-100 is registered with the EPA as a gasoline additive, is designed to impart

gasoline detergency, has detergent properties, is part of the class or kind of articles that impart

detergency when added to gasoline, retains its chemical properties when blended in a DCA

package, and is dedicated for use as a gasoline detergent. Further, this Court is not hemmed in

by EPA regulations or BASF's customers' expectations. HTSUS heading 3811 does not require

that EPA or customer requirements be met for goods to be classifiable in the heading.

Accordingly, this Court finds that PURADD® FD-100 is of the class or kind of goods

classifiable in HTSUS heading 3811.

   Once the class or kind to which the imported article belongs has been ascertained, this

Court must determine the principal use of that class or kind at or immediately prior to

importation. This Court has defined "principal use" as "the use 'which exceeds any other single

use'" of the article.  Lenox Collections v. United States, 20 CIT 194, 196 (1996) (citing

Conversion of the Tariff Schedules of the United States Annotated Into the Nomenclature

Structure of the Harmonized System: Submitting Report at 34-35 (USITC Pub. No. 1400) (June

1983)) (emphasis in original); see also Minnetonka Brands, 24 CIT at 651; USR Optonix, 362 F.

Supp. 2d at 1381.  This Court has long-recognized that AUSRI 1(a) requires a determination of

"the principal use of the class or kind of goods to which the imports belong and not the principal

use of the specific imports."  Group Italglass U.S.A., Inc. v. United States, 17 CIT 1177, 1177,

839 F. Supp. 866 (1993) (emphasis in original); see also Lenox Collections v. United States, 19

CIT 345, 346 (1995); Minnetonka Brands, 24 CIT at 651; USR Optonix, 362 F. Supp. 2d at

1381.

> Evidence of the actual or principal use of the specific imports standing alone
> could not, absent their constituting the entire class or kind of goods under
> consideration, make a prima facie case on the issue of principal use where the
> controlling issue is the principal use of the class or kind to which the merchandise
> belongs.

Group Italglass, 17 CIT at 1177 n.1.  Accordingly, actual use of an imported item is irrelevant to

classification in a principal use provision.  See Clarendon Mktg., Inc. v. United States, 144 F.3d

1464, 1467 (Fed. Cir. 1998) ("[A] principal (or chief) use provision . . . may function as a

controlling legal label, in the sense that even if a particular import is proven to be actually used

inconsistently with its principal use, the import is nevertheless classified according to its

principal use.")

The evidence presented at trial makes clear that the principal use of PURADD® FD-100

is as an additive for gasoline.  For starters, PURADD® FD-100 is registered with the EPA as a

gasoline additive, which is a very clear indication that the product is for use in gasoline.  (Trial

Tr. 112 (PURADD® FD-100 "is registered so that someone can use it to add it into gasoline.").) In addition, Dr. Fehr and Mr. Ketcham each testified that PURADD® FD-100 could be added directly to gasoline but is blended with other DCA package components before being added to gasoline for economical reasons. (Id. at 126-27, 225-26, 230.) Mr. Ketcham also testified that PIBAs "are detergent additives, components, or for gasoline." (Id. at 220 (emphasis added).) Furthermore, BASF sells PURADD® FD-100 through its "Fuel Additives" business unit, (id. at 291 (emphasis added)), and identifies its PIBAs as part of BASF's "complete line of fuel detergent additives," (Def.'s Ex. P (emphasis added)). Moreover, Dr. Crawford (Defendant's expert witness) testified that additives blended together to create a DCA package "retain their individual chemical identities in the blend of additives and could be separated yielding the same starting materials if so desired." (Trial Tr. 359; see also id. at 118.) Dr. Crawford also pointed out that blending the additives neither forms new chemical bonds nor breaks existing bonds. (Id. at 359.)

Plaintiff makes much of its position PURADD® FD-100 cannot be certified as a DCA package and does not meet customer expectations as a fuel detergent. Plaintiff, therefore, concludes that PURADD® FD-100 cannot be classifiable in HTSUS tariff heading 3811. Plaintiff is simply overstating the requirements of the heading. In fact, the EN for heading 3811 state that "[t]he preparations of this heading are additives for mineral oils or for other liquids used for the same purposes to eliminate or reduce undesirable properties, or to impart or enhance desirable properties." EN 38.11 at p.687 (emphasis added). Based upon the EN, in order to be classifiable in heading 3811, PURADD® FD-100 need not eliminate intake system deposits; it is sufficient that PURADD® FD-100 reduce such deposits. BASF's patent establishes that

PURADD® FD-100 is "useful in controlling deposit formation." (Trial Tr. 343; see also id. at 141-42, 146; Def.'s Ex. K.) Thus, this Court finds that PURADD® FD-100–at a minimum–reduces undesirable intake system deposits, thereby satisfying the EN for heading 3811.

Based upon the evidence presented at trial, this Court finds that PURADD® FD-100 satisfies the requirements of HTSUS heading 3811 as a prepared additive for gasoline. Plaintiff's own witness confirmed this conclusion by testifying that PURADD® FD-100 is a "prepared" (id. at 107) "additive" (id. at 111) that is "registered [with the EPA] so that someone can use it to add it into a gasoline" (id. at 112 (emphasis added)). (See also id. at 121 (each of the components of a DCA package is a gasoline additive).) Further, Plaintiff's own expert testified that PURADD® FD-100 is a prepared additive that finds it way into gasoline. (Id. at 231.) In addition, the Court notes that PIBA is recognized as an "[e]ffective, modern detergent additive[]" for inlet valve cleanliness when added to automotive fuels. Ullmann's Encyclopedia of Industrial Chemistry 260 (6th ed., WILEY-VCH Verlag GmbH & Co. KgaA 2003). This Court does not dispute that PURADD® FD-100 is more effective when blended with carrier oil. However, HTSUS heading 3811 is not restricted to "effective" prepared additives for mineral oils. Even without the carrier oil, the evidence and testimony presented at trial clearly demonstrated that PURADD® FD-100–alone–prevents, neutralizes, disperses, and removes intake system deposits. Hence, PURADD® FD-100 is prima facie classifiable in HTSUS heading 3811.

B.      Relative specificity (GRI 3(a))

This Court found herein that PURADD® FD-100 is prima facie classifiable in both HTSUS headings 3811 and 3902. As between these two, this Court must decide which is legally correct.

When goods are prima facie classifiable under two or more headings of the HTSUS, GRI 3(a) dictates that "[t]he heading which provides the most specific description shall be preferred to headings providing a more general description." "Under this so-called rule of relative specificity, we look to the provision with requirements that are more difficult to satisfy and that describe the article with the greatest degree of accuracy and certainty." Orlando Food, 140 F.3d at 1441. This Court's decision is guided by the general rule in customs law "that in the absence of legislative intent to the contrary, a product described by both a use provision and an eo nomine provision is generally more specifically provided for under the use provision." United States v. Siemens Am., Inc., 68 CCPA 62, C.A.D. 1266, 653 F.2d 471, 478 (1981). The Court is not obliged to use this general rule, but it is "a convenient rule of thumb for resolving issues where the competing provisions are otherwise in balance." United States v. Simon Saw & Steel Co., 51 CCPA 33, 40, C.A.D. 834 (1964) (emphasis in original).

This Court finds that HTSUS heading 3811 is the more specific of the two competing headings. The Court first notes that heading 3811 is a use provision, and heading 3902 is an eo nomine provision. Where in balance, a use provisions is generally more specific than an eo nomine provision. Further, each of the exemplars listed in heading 3811–like PURADD® FD-100–has been specifically designed, engineered, processed, manufactured, and blended to have a desired effect when added to mineral oil (or the like). In addition, the articles classifiable

heading 3811 each has a limited function and purpose. In fact, very nearly all of the imported

PURADD® FD-100 is consumed by its limited use as a detergent-active component.

On the other hand, heading 3902 describes the articles classifiable therein in quite general

terms. In addition, the articles classifiable in heading 3902 need not have a specific function or

purpose. It follows then that PURADD® FD-100, in its "narrow aspect," is a prepared additive

for mineral oil, and in its "wider" aspect, PURADD® FD-100 is PIBA in hydrocarbon solvent,

which is "a generic term designating all articles of that character." Fink v. United States, 170

U.S. 584, 587 (1898).

This court previously addressed a similar classification problem. In Mitsui

Petrochemicals, the tariff classification of Visnex, a chemical used solely as a viscosity improver

in lubricating oils, was before the court. Mitsui Petrochems. (Am.), Ltd. v. United States, 21 CIT

882 (1997). The court found as a matter of law that Visnex was prima facie classifiable under

tariff headings 3811 and 3902. Id. at 885. In applying GRI 3(a) to the competing headings, the

court noted that the more specific heading "'is [the] more definite in its application to the article

in question than is the other.'" Id. at 886 (quoting Fink, 170 U.S. at 587). The court noted that

subheading 3902.30.00 might include multiple potential chemical combinations and

concentrations of propylene, id. at 887, with "a myriad of applications," id. at 888. As a result,

the court found that tariff subheading 3902.30.00 was a "general chemical subheading" with a

comprehensive grouping. Id. at 887.

In contrast, the court found it compelling that Visnex was imported "solely for use as

viscosity improver for lubricating oil." Id. The court stated that "[i]t follows that the language of

subheading 3811.29.00, which embraces viscosity improvers which are additives for lubricating

oil, 'more definitely applies' to Visnex than does the generic provision under subheading

3902.30.00, propylene copolymers." Id. The court held that subheading 3811.29.00 was the

more difficult to satisfy because it "embodies a smaller number of compounds." Id. at 888. The

court also acknowledged the general principle that "a use provision will describe the article with

greater specificity and, therefore, provide the correct classification." Id. at 889.

This Court also finds that HTSUS heading 3811 is more specific than heading 3902

because the requirements of heading 3811 are the more difficult to satisfy. Further the principle

of use supports the conclusion that the use provision of heading 3811 is more specific than the eo

nomine provision of heading 3902. Accordingly, by operation of GRI 3(a), PURADD® FD-100

is classifiable in HTSUS tariff heading 3811.[22]

---

[22]The conclusion reached by this Court also is consistent with a limiting note found in the EN:

> When as a result of the addition of certain substances, the resultant products
> answer to the description in a more specific heading elsewhere in the
> Nomenclature, they are excluded from Chapter 39; this is for example, the case
> with:
> * * *
> (b)     Prepared additives for mineral oils (heading 38.11).

EN Ch. 39 at p.718. Due to the addition of the hydrocarbon solvent and amine tail to the PIB to create BASF's PIBA product, or PURADD® FD-100, this Court finds that the limiting rule in the EN applies in this case and directs that PURADD® FD-100 is classifiable in the more specific HTSUS heading, namely heading 3811.

**IV.     The Applicable Subheading for PURADD® FD-100 is 3811.90.00.**

With the applicable HTSUS heading for PURADD® FD-100 selected, the Court may turn its attention to determining the proper subheading into which PURADD® FD-100 falls. Because PURADD® FD-100 is neither an antiknock preparation (subheadings 3811.11 and 3811.19) nor an additive for lubricating oils (subheadings 3811.21 and 3811.29), PURADD® FD-100 must be classified in HTSUS subheading 3811.90.00, the "other" category.

CONCLUSION

For the reasons stated herein, this Court finds that the proper classification of PURADD® FD-100 is 3811.90.00.  Accordingly, judgment is entered for Defendant.

/s/        Gregory W. Carman
Gregory W. Carman

Dated:  February 28, 2006.
          New York, New York

**ERRATUM**

<u>BASF Corporation v. United States</u>, Court No. 002-00260, Slip Op. 06-28, dated February 28, 2006:

      Page 1, "<u>Michael W. Heydrich</u> Office of General Counsel, United States Customs Service, of counsel," is added before "for Defendant" as counsel for Defendant.

February 28, 2006